**E. R. SOVEREIGN and Phyllis Sovereign, Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 12939.**

United States Court of Appeals
Seventh Circuit.
Aug. 2, 1960.

Louis L. Meldman, Sherwin C. Peltin, Milwaukee, Wis., for petitioners.

Charles K. Rice, Asst. Atty. Gen., Tax Division, Louise Foster, Atty., U. S. Dept. of Justice, Washington, D. C., for respondent.

Before SCHNACKENBERG, KNOCH and CASTLE, Circuit Judges.

KNOCH, Circuit Judge.

E. R. Sovereign and Phyllis Sovereign, his wife, have appealed decisions of the Tax Court sustaining deficiencies in income tax assessed against them. Appellants list errors alleged to arise out of failure to apply the law correctly, reliance on a theory raised by neither party, failure to allow additional hearing and presentation of evidence on that theory, and failure to base the decisions on the facts of record.

E. R. Sovereign was a licensed real estate broker who sold some 600 lots on a commission basis in the years 1951 through 1955. In addition, he sold 35 lots, held in the name of Mrs. Sovereign, allegedly used in Mr. Sovereign's business for advertising, assistance in annexation of areas, or prevention of sale to a builder of "inferior" houses. Petitioners contend that all these lots were acquired for use in Mr. Sovereign's brokerage business, and that profits on these lots, when eventually sold, were taxable as capital gains under Section 117(j), Internal Revenue Code of 1939, 26 U.S.C.A. § 117(j), or Section 1231, Internal Revenue Code of 1954, 26 U.S.C.A. § 1231.

The pertinent sections are as follows: Internal Revenue Code of 1939:

Section 117 [as amended by Section 151, Revenue Act of 1942, c. 619, 56 Stat. 798, and Section 210 (a), Revenue Act of 1950, c. 994, 64 Stat. 906.]

"Capital gains and losses

"(a) Definitions.—As used in this chapter—

"(1) Capital assets. The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

"(A) stock in trade of the taxpayer or other property of a kind

which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

"(B) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 23(*l*), or real property used in his trade or business;

\*     \*     \*     \*     \*

"(j) Gains and losses from involuntary conversion and from the sale or exchange of certain property used in the trade or business.

"(1) Definition of property used in the trade or business. For the purposes of this subsection, the term 'property used in the trade or business' means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (*l*), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, \*  \*  \*

"(2) General rule. If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion \*  \*  \*  of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months.  \*  \*  \*"
[26 U.S.C.A. (I.R.C.1939) § 117]

Section 1221(1) and (2) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 1221 (1, 2) contains substantially the same provisions as Section 117(a) (1) (A) and (B), supra, and Section 1231(a) and (b) of the 1954 Code is very similar to Section 117(j) (1) and (2).

The Tax Court held that the gains from the sales of these 35 lots constituted ordinary income.

The evidence showed that Mr. Sovereign acted as an authorized broker for the City and County of Milwaukee, as well as for private owners, in selling unimproved building lots. He sold some of these to his wife, or bought some of these in his wife's name. He charged a broker's commission for these sales. On each of these lots he placed a "for sale" sign, which bore his name, a designation such as "the lot specialist," and his telephone number. Superimposed on this sign would be a smaller sign reading "sold." The object of these signs was to stimulate listings from other property owners by indicating that Mr. Sovereign was selling successfully in the area. In his stipulated statement of the evidence, Mr. Sovereign said, (Appendix, p. 15a) that the City and County of Milwaukee refused to permit brokers' signs on their lots and that:

"To sell their lots, I occasionally bought one for advertising in the center of a large group on a well-traveled street in Mrs. Sovereign's name. Only after it was in my wife's name could I advertise on it."

When adjacent lots were sold, Mr. Sovereign would re-sell the lots originally bought in Mrs. Sovereign's name. He argues that these lots were used for advertising and then sold only when they had served their advertising purpose, or, in some cases, when it became apparent that the advertising effort was unsuccessful. Although sometimes the profit was small, in no case were these lots sold at a loss.

The local Real Estate Board, on investigation of several charges that Mr. Sovereign was engaging in fraudulent advertising, was satisfied that there actually had been sales to Mrs. Sovereign, handled by Mr. Sovereign, as broker for the prior owners of the various lots.

Mr. Sovereign used similar signs on seven swamp lots, originally owned by the County of Milwaukee, and sold by Mr. Sovereign, as broker, to Mrs. Sovereign. He testified (Appendix B, p. 36):

> "I wanted to show people I could sell anything."

Some of these swamp lots were improved by addition of earth fill, but otherwise no effort was made to improve any of these 35 lots.

Eight of the lots were in locations adjacent to the corporate limits of the City of Milwaukee and near other lots Mr. Sovereign was handling as broker. He bought these for Mrs. Sovereign in order to obtain the requisite number of property owners' signatures to secure annexation to the City and make water and sewer facilities available. These lots were also used in advertising through "sold" signs and were re-sold after annexation was effected.

Two lots were being offered at prices lower than those being asked by Mr. Sovereign, for lots which he was handling in the area, and lower than the value Mr. Sovereign considered proper. He feared damage to adjacent property values should the lots be sold to persons who would erect "inferior" housing. Mr. Sovereign, therefore, bought these two lots for Mrs. Sovereign. These two lots were re-sold without delay. Of one, Mr. Sovereign said (Appendix B, p. 34) that he "turned it over immediately" and when asked " * * * did you know that is what you intended to do with it when you bought it?" he answered, "Yes, that was a short term case."

The Tax Court found that the cost of all the signs was deducted as a current operating expense of Mr. Sovereign's brokerage business.

The great majority of all the lots Mr. Sovereign handled were sold to house building contractors, many of whom approached him; but sometimes Mr. Sovereign took the initiative. The Tax Court found that purchasers were found for the 35 lots in question by the same procedures as used for the other lots handled by Mr. Sovereign. Mr. Sovereign argues that there is only one way to sell lots, and he takes issue with an analogy used by the Tax Court: that the method used by Mr. Sovereign resembled that of a retailer who exhibits items taken out of his inventory and who then eventually sells the exhibited items. Mr. Sovereign also contends that the factors relied on by the Tax Court, such as quantity and frequency of sales, similarity of method, and profit on all sales, do not in themselves prove that proceeds of the lots were or were not qualified for capital gains treatment.

It has been held that no fixed rule of thumb determines whether property is held primarily for sale to customers in the ordinary course of business, and each case must rest on its own facts. No single test is dispositive. Factors which have been considered are: the purposes for which the property was acquired or held; improvements; frequency, number and continuity of sales; extent and substantiality of transactions; nature and extent of taxpayer's business, advertising or listing. Kaltreider v. C. I. R., 3 Cir., 1958, 255 F.2d 833, 838; Stockton Harbor v. C. I. R., 9 Cir., 1954, 216 F.2d 638, 650, certiorari denied 349 U.S. 904, 75 S.Ct. 581, 99 L.Ed. 1241.

As to the relatively short periods these lots were held, appellants remind us that the sale of subdivided lots is a dynamic, rapidly-moving business. They assert that Mr. Sovereign sold the lots in question when these were no longer needed in his business, sometimes just prior to six months after acquisition dates, although more favorable tax treatment is given to assets held more than six months.

We agree with appellants' contention that determinations of the sort made here must be based on consideration of all of the facts. It appears to us that all of the facts were considered by the Tax Court. Contrary to appellants' assertion, we do not find that Mr. Sovereign's detailed testimony has been ignored. The Tax Court's analyses of the case in the opinion and in the ruling on the motions for rehearing, etc., show that Mr. Sovereign's testimony was given close scrutiny. The Tax Court drew inferences contrary to those Mr. Sovereign urged upon that Court, and upon us, but these were inferences reasonably drawn from the evidence presented.

The Tax Court's decisions were based on two alternative grounds. The first ground stated in the Tax Court's opinion is that, under Section 117(j) of the 1939 Code, and under Section 1231 of the 1954 Code, which pertain to gains or losses from sale of property used in business, the property and the business, in which it is used, must be owned by the same taxpayer, and that these sections do not apply to situations where a wife derives gain from sale of her separately owned property, used in a business owned solely by her husband, even though the gains are reported in a joint tax return, as here.

It is this ground which Mr. Sovereign attacks as based on an issue neither presented nor argued by either party. Both sides, he asserts, argued the case on the presumption that the title in Mrs. Sovereign's name was not significant and represented a mere formality. Appellants contend that having decided, even in part, on that basis, the Tax Court erred in refusing appellants an opportunity to present further evidence on this "key issue," to show that Mrs. Sovereign owned no lots other than these 35, that she had no other connection with real estate activity and that the lots qualified as capital assets of her own. Appellants argue that Mr. Sovereign's statement that the lots were not "investments" does not negative their being capital assets. In any case, appellants protest the holding that if the lots were owned by Mrs. Sovereign, they must have been used in her business to qualify for capital gains treatment. This holding was based on Treasury Regulations construing the pertinent sections.

The Commissioner contends that there was ample opportunity to present evidence on all angles of the case; that evidence was adduced by appellants to show that Mrs. Sovereign held title to the lots and usually signed papers pertaining to sales; but that evidence was also produced to show that Mr. Sovereign actually acquired the lots and sometimes acted as though he were the owner.

■■ We agree with the Tax Court that, in any event, the gain was taxable as ordinary gain regardless of whether the lots were owned by Mrs. Sovereign and sold for her by Mr. Sovereign as her broker, or whether they were owned by and sold for Mr. Sovereign himself. This holding was based on the Tax Court's second alternative ground that these 35 lots were held primarily for sale to customers in the ordinary course of business. The Tax Court considered the quantity, frequency, continuity and substantiality of the sales, the method of sale, the fact of sale at a profit, and found that the dominant purpose of acquisition and holding was to produce profit by sale to customers in the course of a continuing business; that the use of the lots for the posting of signs, to illustrate Mr. Sovereign's efficiency as a broker, was of a temporary and transitory character. The signs themselves consisted mainly of printed cardboard tacked to stakes. These were sometimes replaced to keep them attractive in appearance. The Tax Court held that there was no general or indefinite commitment of the lots to use in Mr. Sovereign's business; that these 35 lots were held primarily for sale to customers notwithstanding temporary use incidental to Mr. Sovereign's business. Temporary use of property in a business does not prevent its classification as primarily held for sale to custom-

ers in the course of business. Duval Motor Co. v. C. I. R., 5 Cir., 1959, 264 F.2d 548, 552. It was clear that, from the time of acquisition, Mr. Sovereign intended ultimately to sell each of these lots in the ordinary course of his business when it had served its temporary purpose.

As noted in the opinion of the Tax Court, the preferential treatment, provided by the statutes in question, applies to transactions which are not the normal source of business income. The sections under consideration provide an exception, which must be narrowly applied, and its exclusions interpreted broadly to effectuate the basic Congressional purpose. Corn Products Co. v. C. I. R., 1955, 350 U.S. 46, 52, 76 S.Ct. 20, 100 L.Ed. 29.

Thus the question before the Tax Court was primarily one of fact. In Home Co. v. C. I. R., 10 Cir., 1954, 212 F.2d 637, at page 639, the Court said:

"Whether property sold or disposed of by a taxpayer was held for sale to customers in the ordinary course of his trade or business within the meaning of Section 117(a) is essentially a question of fact and, since it is the duty of the Tax Court to weigh evidence, draw inferences, make deductions and find the facts, the finding of fact by that court will not be disturbed on review if it is supported by substantial evidence and is not clearly erroneous."

To the same effect is Rubino v. C. I. R., 9 Cir., 1951, 186 F.2d 304, certiorari denied 342 U.S. 814, 72 S.Ct. 28, 96 L.Ed. 615.

Although appellants contend that the Tax Court's finding of fact in this regard is incorrect, there was ample evidence to support the finding that the primary and dominant (if not exclusive) purpose of the acquisition and holding of these 35 lots was for sale to customers in the course of Mr. Sovereign's business.

Appellants rely on Goldberg v. C. I. R., 5 Cir., 1955, 223 F.2d 709, to show the importance of the original purpose in acquisition. In that case Pinecrest Housing Inc. was incorporated in 1943 to erect or repair buildings or improvements, purchase, sell, rent, subdivide, and improve real property. That same year, the corporation had 111 housing units in an area where there was an acute need because of influx of defense workers The project was financed by an insurance company upon an F.H.A. guaranty of 90% of appraised value. Although designed for rental, under F.H.A. Regulations, the houses could be sold at a fixed maximum to war workers under specified conditions. In 1945 some of these restrictions were revoked. In April 1944 the corporation had had difficulty meeting mortgage payments because of insufficient rental income. Two of the four stockholders sold out to the other two, Nathan D. Goldberg and S. E. Wood, Jr. Later rentals increased and mortgage payments resumed. Profits were realized from sales of the houses, mostly to the tenants, sales being handled by Mr. Goldberg, whose office was paid $100 monthly for keeping rental and sales records. There was no advertising at all and no commissions were paid. Availability for sale was known only by word of mouth. The corporation dissolved in 1946. Mr. Wood was an automobile dealer, not in the business of buying and selling real estate and not licensed to do so, although he occasionally did sell a parcel. Mr. Goldberg was an experienced real estate agent in property management for others, occasionally selling properties on commission, but there was no evidence that he bought and sold on his own account as a business. The Court of Appeals held that it was clear that the owners did not intend to engage in the business of buying and selling real estate, but intended only to rent it—perhaps because of restraints by wartime legislation or the terms of the loan. When years later, the property was sold, the Court thought (page 712):

"The test as to whether the capital gain provisions apply in such event is, at bottom, whether the purpose of the sales is primarily making money by carrying on a substantial part of the activities of a person engaged in the business of selling houses, or to dispose of or liquidate the rental business. If the latter is the case, the owner obtains capital gain benefits."

The Court went on to say:

"If the property was originally acquired for rental purposes, it may nevertheless later be held for ordinary business sale to customers; and the converse may also be true. But the original purpose is important, * * *."

However, the original purpose does not control if the purpose of holding the lots changed prior to sale. In Friend v. C. I. R., 10 Cir., 1952, 198 F.2d 285, at page 288, 46 A.L.R.2d 761, the Court said:

"While his intention at the time of acquiring the property, at the time of the making of further improvements, and at the time of causing the property to be rezoned was a matter for appropriate consideration of the Tax Court, it was not controlling. The ultimate question of decisive consequence was the purpose for which he was holding the property at the time of the sales. [citing cases]."

After review of the record we cannot hold the Tax Court's findings to be "clearly erroneous" and therefore we may not set them aside. We cannot substitute our own judgment as to fact for that of the Tax Court and can upset the findings only if there is no substantial evidence to support them. Stockton Harbor v. C. I. R., 9 Cir., 1954, 216 F.2d 638, 650, certiorari denied 349 U.S. 904, 75 S.Ct. 581, 99 L.Ed. 1241.

The judgment of the Tax Court is affirmed.