JUAN VALLDEJULI RODRÍGUEZ, Plaintiff and Appellee, v. SECRETARY OF THE TREASURY, Defendant and Appellant.

No. 549. Decided September 24, 1963.

*J. B. Fernández Badillo*, Solicitor General, and *Genoveva R. de Carrera*, Assistant Solicitor General, for appellant. *Elí B. Arroyo* for appellee.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra.

MR. JUSTICE HERNÁNDEZ MATOS delivered the opinion of the Court.

In September 1959 taxpayer Valldejuli Rodríguez filed a complaint against the Secretary of the Treasury in the San Juan Part of the Superior Court praying that certain deficiencies in the payment of the income tax for 1954 and 1955, amounting to $99,031.87, be set aside to the extent in which he challenges them. In paragraph 3 thereof he stated:

"The deficiencies notified are erroneous:

*Year 1954*

 (a) the following items were unduly included as taxable income:
1. an alleged profit of $3,800 realized from the exchange of a rural property identified by No. 3,833.
2. an alleged profit of $20,327.86 realized from the exchange of taxpayer's residence.

 (b) the following deductions claimed by the taxpayer were unduly disallowed:

| | |
|---|---|
| 1. taxes paid | $ 606.84 |
| 2. travel expenses and miscellany | 2,312.00 |
| 3. interest owing and allegedly paid by Juan T. Peñagarícano | 480.00 |

*Year 1955*

 (a) the sum of $98,459.17 was unduly included as taxable income, considering the sum received as 'share of the profits' from the sale of a property in Isla Verde."

The complaint was answered denying that the deficiencies notified were erroneous. The trial was held on March 4, 1960. At the outset the parties stipulated that the controversy would be confined to two items, to wit: that of $3,800 for 1954 and that of $98,459.17 for 1955. They stipulated as to certain documentary evidence, and the case was submitted on plaintiff's oral evidence.

Judgment was rendered on January 12, 1961. The judgment set aside the above two deficiencies. The findings of fact of the Superior Court are as follows:

"FINDINGS OF FACT.—Plaintiff is a lawyer, farmer, and receives income. He entered the practice of the legal profession in 1922. From 1938 to 1944 he acquired by purchase the following properties (Exhibit 11 of both parties) lying in the ward of Sabana Llana of Río Piedras, all of which adjoin each other forming one single piece of property, for the purpose of residing therein or devoting them to agriculture:

| Location | Date of Purchase | Area (Cuerdas) | Purchased from | Deed |
|---|---|---|---|---|
| Sabana Llana | 5/14/38 | 124.50 | Ernesto López | 113-Antonio López |
| " | 6/ 6/38 | 3.96 | Mauricio Viera | 15-Otto Riefkohl |
| " | 2/22/41 | 25.00 | Belén widow Tous | 17-R. Hernández |
| " | 5/ 9/44 | 49.52 | Carlos Colón | 27-Sergio León |
| " | " | 1.00 | " " | 27-Sergio León |

"Plaintiff lived with his family on above-described properties where he constructed a cattle stable and planted grass and did truck gardening. In 1945 the Housing Authority condemned part of the property, and he moved to Cayey to a property of 4.208 cuerdas which he had acquired by purchase in December 1944, having ceded the use of the Sabana Llana residence to his brother-in-law. In 1949 he sold to the Housing Authority the remainder of the Sabana Llana property because he feared they would condemn it.

"Plaintiff was granted the benefits of the provisions on capital gains in connection with this transaction.

"In the period from December 18, 1944 to December 5, 1949 he acquired other properties adjoining the Cayey property in order to form an agricultural estate, which are enumerated below:

| Location | Date of Purchase | Area (Cuerdas) | Purchased from | Deed |
|---|---|---|---|---|
| Cayey | 12/18/44 | 4.208 | Carolina Núñez | 84-Ángel M. Díaz |
| " | 4/27/45 | 164.9881 | Arturo Aponte | 84-Víctor M. Pons |
| " | 4/27/45 | 64.50 | Arturo Aponte | " |
| " | " | 4.50 | " | " |
| Cidra | 7/14/48 | 13.00 | Rosa M. Rodríguez | 217-Luis Rodríguez Morales |
| " | " | 3.00 | " | " |
| " | " | 20.00 | " | " |
| " | " | 12.00 | " | " |
| Cayey | 12/5/49 | 192.06 | | 153-Víctor M. Pons |

"In 1945 he received the money which had been deposited in the condemnation case of Sabana Llana, with which he acquired the properties in the Cayey-Cidra zone. He took his two children who were agricultural engineers to work with him. Subsequently, being alone and unable to tend the business, he sold to Aurelio Tió all the sugarcane land, reserving only a parcel of land where he had built his residential house at a cost of $140,000. Upon transacting the sale with Tió, plaintiff had no quota left for planting sugarcane, as a result of which the residential house became a 'white elephant' and in 1954 he exchanged it for a property in Guaynabo owned by Tomás Peñagarícano.

"On March 26, 1951 he acquired by purchase and for agricultural purposes a property in Isla Verde, jurisdiction of Carolina. It had 12,000 coconut palm trees which at that time were sold at a good price. Moreover, since it had pastures, he used it for raising cows. When making that investment, he took into consideration the location of the property on a zone which was acquiring economic importance because of its proximity to the airport which was then under construction.

"As a result of a notice of income tax deficiency which he considered unfair, he decided to sell all his properties and

to leave Puerto Rico. In accordance with this decision, in 1953 he sold the Isla Verde property . . . for $202,000, plus an additional sum equivalent to one third of the difference between the selling price and the price at which the purchasers would sell in the future, if it exceeded the former. The purchasers sold the property and each of them paid to plaintiff the price in excess of the amount agreed upon.

"In 1954 he acquired by exchange a property in Guaynabo, delivered his residence in Cayey, and purchased a property of about 98 cuerdas in Vega Alta, where he moved his residence and reconstructed the house existing therein. He leased the Guaynabo property to the former owner, Peñagarícano, for the latter to establish therein the sugarcane quota of the Cayey property which he acquired from plaintiff. This lease lasted from three to four years. Plaintiff planned to devote the Guaynabo property to agriculture and the cattle and dairy business with the help of one of his children who was back. He sold this property in 1958 because he was offered and agreed with the purchaser on the price of $900,000. Defendant admitted that the gain realized from that sale was a long-term capital gain.

"In 1957 he sold to Miguel Martorell the property which he acquired in Vega Alta in 1954, together with the residence therein established.

"Late in 1956 and early in 1957 he purchased two adjoining properties in the ward of Sabana Seca of Toa Baja. He leased part of the property to the Radio Corporation of America for a monthly rental of $250 until October 1959, and for $375 from and after that month. He constructed his residence on that property and devoted the unleased lands to cattle raising. On the day of the hearing before this court plaintiff is still the owner of the property and devotes it to the same activities and resides therein.

"In 1956 he acquired a small property for vacationing in the ward of Jagueyes of Aguas Buenas, of which he is still owner.

"In 1958 plaintiff acquired a one-half interest in a property in Loíza having an area of about 783 cuerdas. He purchased it for the purpose of devoting it, and devotes it, to cattle and grazing in view of the future growth in the cattle business in

Puerto Rico caused by the construction of a slaughterhouse in the city of Caguas, sponsored by the Government of the Commonwealth of Puerto Rico, and by the tax incentives offered by the latter to cattle owners. Plaintiff is still the owner of this property.

"Plaintiff never built streets, sewers, or any other improvements on the above-mentioned properties. He has merely fenced them and constructed or reconstructed houses for his residence.

"He never campaigned or advertised for the sale of those properties, nor hired brokers to solicit purchasers.

"In 1937 plaintiff acquired by purchase the Hyde Park property in Río Piedras, to which he took some materials for a house which were stolen on more than one occasion. He decided that it was undesirable to build his house near El Monte slum in that jurisdiction, and leased the property to Nevárez, who is at present owner of a window factory. The cows which Nevárez took to the property were milked at night, the calves and swine were stolen, and for that reason he returned the property to plaintiff and terminated the lease. He took steps to persuade the Government to purchase it for the Boys' Charity School; later he offered it to the Housing Authority (Insular) and then to the Housing Authority (Municipal). The offer was rejected in all cases because of its proximity to that slum. Upon the advice of Campos del Toro and Hostos Gallardo, he urbanized the property in order to render it saleable. These gentlemen furnished the financing. When the sale of lots came to a standstill, Gallardo advised him to organize a corporation for the construction of 100 houses on the lots in order to facilitate the sales, of which corporation plaintiff was stockholder and president. On the date of the hearing held before the court the corporation had not been dissolved, but was inactive.

"Plaintiff testified that he received income from his profession, which he declared in some years and in others he did not; that when his clients are unable to pay, he always renders services to them."

The defendant officer petitioned for review of the judgment on nine grounds which he alleges in his petition. On December 18, 1961, we decided to review "only as to the

determination of the trial court that the taxpayer was not a real-estate broker."

The Solicitor General submitted his brief on the question of review permitted. In his brief the appellee denies for the first time that we have jurisdiction to take cognizance of this petition "in view of the fact that the petition for review was served by registered mail and was received by the appellee on July 17, 1961." In a supplementary brief appellant stated the reasons for objecting to the dismissal for lack of jurisdiction.

I

Let us consider first the incident on dismissal. The tax computations involved were approved on June 15, 1961. On July 14, 1961, appellant filed with the Secretary of this Court: his petition for review, memorandum of authorities, copies of the pleadings of the parties, of the conclusions and judgment of the trial court, and also a copy of the transcript of evidence.

At the bottom of the petition for review he set forth that from San Juan, P.R., on the same day of July 14, 1961: "I have sent copy of the preceding petition and of the memorandum of authorities attached thereto to plaintiff-appellee, to his post-office address, Box 609, San Juan, Puerto Rico."

The copies sent on July 14, 1961, that is, within the 30-day term to request review, were *received* by appellee on July 17, 1961. The latter says, in part, at p. 2 of his brief:

"Rule 53.3 requires that the petition for review be served *'within* the time to request such review,' in this case, *within* the 30 days following June 15, 1962, when the computations were approved. Although appellant filed his petition in Court on July 14, or within the legal term, he did not serve notice thereof within that term. This is so because appellant, without

taking steps to serve personal notice, chose the alternative method of serving notice by mail. By so doing the chances were that service would not be made—as it was not made—*within* the legal term, since it was made on July 17 after 30 days had already elapsed."

■ The former procedure provided by the Code of Civil Procedure for appellants to perfect their petitions for appeal in civil cases, which was not changed by the Rules of Civil Procedure of 1943, underwent an important change with the adoption of the Rules of Civil Procedure of 1958. It consisted in that since by its Rule No. 72, the Rules of 1958 expressly repealed §§ 320 and 321 of the Code of Civil Procedure, notice of the petition may now be served either personally or by mail. In other words, the fact that the parties might reside or have their offices in different places, between which there was a regular mail service, or that the steps provided by § 320 providing the manner for making personal service be unsuccessful, ceased to be an indispensable requirement to make service by mail. In California, in construing §§ 1012 and 1013 of the Code of Civil Procedure (counterpart of our §§ 320 and 321), personal service still has preference over service by mail. *Harris* v. *Minnesota Inv. Co.*, 265 Pac. 306, commented in *Tecon Corporation* v. *Sec. of the Treasury*, 84 P.R.R. 182 (1961); *Dearing* v. *Fessler*, 215 P.2d 60, 96 C.A.2d 386 (1950).

■ According to Rule 53.1(b) of 1958, a review "is perfected by filing a petition with the Secretary of the Supreme Court within thirty (30) days after the entry of a copy of the notice of judgment rendered by the Superior Court." Rule 53.3 provides, in turn, that the petitioner shall serve notice of the petition for review to all the adverse parties within those 30 days, in the manner provided in Rule 67, which in its pertinent part provides:

"67.2—Whenever a party has appeared, represented by an attorney, the service shall be made upon the attorney unless

service upon the party himself is ordered by the court. Service upon the attorney or upon a party shall be made by *delivering a copy to him* or by *mailing it to him* at his last known address, *or, if no address is known, by leaving it with the clerk of the court.* Delivery of a copy within this rule means: handing it to the attorney or to the party; or leaving it at his office with his clerk or other person in charge thereof; or, if there is no one in charge, leaving it in a conspicuous place therein; or, if the office is closed or the person to be served has no office, leaving it at his dwelling house or usual place of abode with some person of suitable age and discretion then residing therein. *Service by mail is complete upon mailing."* (Italics ours.)

■ It may be observed that that rule does not accord preference to the personal service over the service by mail, nor requires that service be made always and in the first place upon the attorney for the party to be served. It provides three different methods for serving notice: (1) by delivery, (2) by mail, and (3) leaving the document with the clerk of the court. It also provides different methods for making the material and direct delivery. If service by mail is chosen, the decisive and controlling factor of its completion is the moment the envelope containing the documents to be served is mailed.

The Rules of Civil Procedure of 1943 contained a provision substantially similar to Rule 67.2 which has been copied. It appeared in Rule 5(b), counterpart of Federal Rule 5(b). However, the decisions construing its application which preceded the Rules of 1958 were not uniform.

In *Cardona* v. *Ortega*, 68 P.R.R. 611, 613 (1948), for example, the appellee prayed for dismissal of the appeal on the ground that the notice of appeal was served upon his attorney by mail and not personally, despite the fact that his attorney as well as appellant's did not have their offices in different places. This Court denied the dismissal on the ground that Rule 5(b) "substitutes the procedure formerly established by § 321 of the Code of Civil Procedure and

authorizes service by mail on the attorney of the adverse party without the former limitation that the person making the service had to reside or have his office at a different place." Yet, in *Hernández* v. *Municipal Court*, 69 P.R.R. 827, 830 (1949), in which the construction of Rule 6(e) was involved, it held that the Rules of 1943 did not contain any provision regarding the procedure to be followed in appeals, and, hence, that nothing therein provided was applicable to appeals. *Collazo* v. *Puig & Abraham*, 70 P.R.R. 780, 781 (1950), reiterates that "the proceeding to regulate the appeals is not provided for in the Rules of Civil Procedure." The same doctrine is invoked in *Vigio* v. *Cartagena*, 70 P.R.R. 566, 568 (1949) ; *People* v. *Carmona*, 70 P.R.R. 292, 294 (1949) ; *Rodríguez* v. *Fonalledas*, 71 P.R.R. 783, 785 (1950). However, with the adoption of the Rules of Civil Procedure of 1958 and the consequent repeal of §§ 320, 321 and 322 of the Code of Civil Procedure by those Rules, any doubt which might exist as to the rules for perfecting petitions for appeal and review has been dispelled.

In *Figueroa* v. *Superior Court*, 85 P.R.R. 77 (Santana Becerra, 1962), in referring to *Hernández* v. *Municipal Court, supra*, we said:

". . . At present the Rules of Civil Procedure govern the procedure of the appeal and of the review, wherefore we are precluded from disposing of this case barely on the decision in *Hernández*."

■ The notice was completed within the statutory period. Appellant mailed the notice of his petition for review on July 14, 1961, one day before the expiration of the term to seek review. The notice was not *received* until July 17, 1961, but the mailing of the notice of the appeal taken on July 14 complied promptly with the requirement contemplated by Rule 67.2.

Rule 67.2, as already stated, is substantially similar to the superseded Rule 5(b) of 1943. As in both of them, the

repealed § 322 of the Code of Civil Procedure provided that service was complete upon mailing. *Serra* v. *Municipal Court*, 49 P.R.R. 528 (1936); *Ex parte Bithorn*, 53 P.R.R. 556, 558 (1938); *Rodríguez* v. *Fonalledas*, 71 P.R.R. 783, 785 (1950); *Alonso* v. *Muñoz*, 74 P.R.R. 817, 818 (1953); *Tugwell, Governor* v. *Barreto*, 67 P.R.R. 512, 516 (1947).

When the Rules of 1943 were in force, the provision that the service was complete upon mailing (§ 322 of the C.C.P.) if the parties resided in different places (§ 321 of the C.C.P.), or whenever the steps taken pursuant to § 320 (C.C.P.) were unsuccessful, was in full force. However, if none of these circumstances was present, it was necessary to limit the effects of the provision of § 322 so as to reconcile it with §§ 320 and 321. If the method of service by mail was chosen when personal delivery was the method called for, the chances were that if it was not received within the term to appeal, the notice was insufficient. *Santana* v. *Salinas*, 54 P.R.R. 109, 113 (1939); *Arandes* v. *Viera; Hernández, Int.*, 75 P.R.R. 148, 151 (1953). If the adverse party received the notice within the term to appeal, such receipt was equivalent to personal notice. *Despiáu* v. *Pérez*, 76 P.R.R. 117, 118 (1954); *Collazo* v. *Puig & Abraham*, 70 P.R.R. 780, 781 (1950).

If the paper is placed in the mail within the term to appeal or seek review, the receipt of the paper beyond that term does not affect the jurisdiction of the reviewing or appellate court. In his comments on Federal Rule 5(b), counterpart of our Rule 67.2, Moore says in Federal Practice, Vol. I, at p. 376:

"It should be noted that the last sentence of Rule 5(b) [67.2] provides that service by mail is complete upon mailing. This is significant. Non-receipt of the paper does not affect the validity of the service."

See *Cardona* v. *Ortega, supra* at 613.

In 5 Barron, Darnieder and Keogh, Federal Practice and Procedure 103 (1951), we find also a similar comment:

"The second method of service under Rule 5(b), is by mailing and such service is complete upon mailing. Therefore placing a paper to be served in the mail on the last day is a valid service even though it might not be received for several days after the expiration of the period given for action in the particular case."

See, also, 1 Barron & Holtzoff, Federal Practice and Procedure 766, § 204 (1960); 4 Cyclopedia of Federal Procedure 9, 10, § 12.10 (1951).

The American case law in the federal civil procedural field has also been consistent in placing upon Rule 5(b) (67.2) the same interpretation of those authors which we have mentioned. In this connection, see *Frierson* v. *McIntyre*, 151 F.Supp. 5, 6 (1953); *Beckstrom* v. *Coastwise Line*, 13 F.R.D. 480, 483 (1953); *Bourne, Inc.* v. *Romero*, 23 F.R.D. 292, 296 (1959); *Rifkin* v. *United States Lines*, 24 F.R.D. 123 (1959); *Napier* v. *The Delaware, Lackawanna and Western Railroad Company*, 223 F.2d 28, 30 (1955); *Williams* v. *Blitz*, 226 F.2d 463, 464 (1955).

In support of his contention the appellee cites the case of *Tecon Corporation* v. *Secretary of the Treasury*, 84 P.R.R. 182 (1961). However, *Tecon Corporation* is not applicable to the present case since the same was decided under the provisions of the Code of Civil Procedure which are abolished at present. The copy of the notice of the judgment was filed in that case on March 7, 1957, and the term to appeal therefore expired on April 6, 1957; in other words, that the incidences of the appellate procedure took place prior to the adoption of the Rules of Civil Procedure of 1958, wherefore the latter were inapplicable.

In view of the foregoing, the dismissal of the appeal for lack of jurisdiction is not in order.

## II

Let us consider the merits of the petition. In our opinion, the trial court's determination that the appellee was not a

real-estate broker was correct, and its judgment should accordingly be affirmed. Let us see.

■■ Among the relief measures contained in the Income Tax Act of 1954 in favor of the taxpayer, one of the most interesting measures is that dealing with Capital Gains or Losses. It is contained in § 117.[1] The gain realized in the sale or exchange of property held by a real-estate dealer is generally considered ordinary income, while the gain realized in the sale or exchange of property held by an "investor" constitutes a capital gain. The difference in treatment is based on the provisions of § 117(a)(1)(A) in defining "capital assets." The term "capital assets," according to that section, means property held by the taxpayer whether or not connected with his trade or business, but it does not include, among other things, "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Hence, in order to classify the appellee as a real-estate dealer or merely as an investor, the ultimate question is whether he held the properties object of the tax deficiency "primarily for sale to customers in the ordinary

---

[1] The pertinent part of that section, as enacted in that year—Sess. Laws 1954 (1), p. 662—insofar as it is relevant, reads as follows:

"Section 117.—*Capital Gains and Losses.*

 (a) *Definitions.*—As used in this Act—

 (1) *Capital assets.*—The term 'capital assets' means property held by the taxpayer whether or not connected with his trade or business, but does not include—

 (A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; or

 (B) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 23(*l*), or real property used in his trade or business.

 (2) *Short-term capital gain.*—The term 'short-term capital gain' means gain from the sale or exchange of a capital asset held for not more than 6 months, if and to the extent such gain is taken into account in computing gross income."

course of his business." 3B Mertens, Law of Federal Income Taxation 622, § 22.138. Such determination is a question of fact. *Patterson* v. *Belcher*, 302 F.2d 289, 297 (1962); *Loans and Service, Inc.* v. *United States*, 193 F.Supp. 683, 686 (1961); *Cebrian* v. *United States*, 181 F.Supp. 412, 418 (1960). Since this is so, the same will be upheld provided it represents the most rational, fair and juridical balance, and is not therefore clearly and manifestly erroneous. Rule 43.1 of the Rules of Civil Procedure of 1958; *Goenaga* v. *O'Neill*, 85 P.R.R. 162 (1962); *Friend* v. *Comm'r*, 198 F.2d 285, 287 (1952); Weithorn, *"Dealer"* v. *"Investor" Problem*, 11 Tax L. Rev. 157, 161 (1956); *Campbell County State Bank, Inc., of Herreid* v. *C.I.R.*, 311 F.2d 374, 377 (January 3, 1963); *Loco Realty Co.* v. *C.I.R.*, 306 F.2d 207, 209 (1962); *Freedman* v. *C.I.R.*, 301 F.2d 359, 360 (1962); *Schoenberg* v. *C.I.R.*, 302 F.2d 416, 419 (1962); *Urban Redevelopment* v. *C.I.R.*, 294 F.2d 328, 332 (1961); *Sachs* v. *C.I.R.*, 277 F.2d 879, 881 (1960).

■ The courts have evolved a number of factors in determining whether property is held primarily for sale in the ordinary course of business. Among them are: (a) the purpose for which the property was acquired; (b) the purpose for which it was held; (c) the improvements made by the taxpayer and their extent; (d) the frequency, number and continuity of the sales; (e) the nature and extent of the taxpayer's business; (f) extent of the sales promotion publicity, or the absence of such publicity. Mertens, Law of Federal Income Taxation 77, § 22.15; *Stockton Harbor* v. *Comm'r*, 216 F.2d 638, 650 (1954); and other cases therein cited. These factors, as well as any others which may aid in ascertaining whether it is held for sale or for investment purposes, must be considered in deciding whether the holder acts in the capacity of a real-estate dealer or of an "investor," for the purposes of the capital gain benefit granted by § 117 of the Act. However, it cannot be said that greater

importance should be attached to a particular factor than to another. The importance of each depends on the whole of the facts of each particular case. For that reason it has been correctly said that they are only guides, not "rules," which aid in determining whether one is a dealer or an "investor." Pennell, *Capital Gains in Real Estate Transactions*, Tulane Tax Institute 23 (1959).

■ In *Nolla* v. *Sec. of the Treasury*, 76 P.R.R. 721, 727 (1954), we said:

"The cases in this field are sometimes difficult to reconcile. They have been called a 'hodgepodge'. Miller, *The 'Capital Asset' Concept: A Critique of Capital Gains Taxation: 1*, 59 Yale L.J. 837, 863, footnote 134; *id.*, p. 877. This is partly due to the circumstance that each case must be determined on its facts; it is also partly due to the lack of definiteness and precision in the statutory standard."

In *Austin* v. *C.I.R.*, 263 F.2d 460, 462 (1959), the following was said: "In final analysis, however, each case must be decided upon its particular facts, and the presence of any one or more of these factors may or may not be determinative of a particular case. It is rare indeed that one will find any precedent value in applying the decision of one case to the facts of another case. At the most, other cases decided by the courts on this subject may be persuasive or suggestive . . . ." Cf. *Keliher* v. *Brownell*, 192 F.Supp. 548, 550 (1961); *Alabama Mineral Land Co.* v. *Commissioner*, 250 F.2d 870, 872 (1957); *Sovereign* v. *C.I.R.*, 281 F.2d 830, 833 (1960); *Wood* v. *C.I.R.*, 276 F.2d 586, 590 (1960); *Pool* v. *Commissioner of Internal Revenue*, 251 F.2d 233, 236 (1957); *Tidwell* v. *C.I.R.*, 298 F.2d 864, 866 (1962).

■ A close examination of the evidence as a whole shows that the court acted correctly in holding that plaintiff-appellee was not a "real-estate dealer," and that he therefore had the right to demand that the tax be levied on the basis of

25 percent and not on the basis of 100 percent, as in the case of ordinary income.

In *Boomhower* v. *United States*, 74 F.Supp. 997, 1007 (1947), it was said:

". . . it has frequently been held that the fact that the real estate involved was not originally acquired for the purpose of sale does not prevent the taxpayer's activities in connection with the sale of it from constituting a business. . . . However, the reasons for and circumstances surrounding the original acquisition do lend color to the entire transaction and in the interpretation of later conduct."

*Cf. Dougherty* v. *Comm.*, 216 F.2d 110, 111 (1954); *Hollis* v. *United States*, 121 F.Supp. 191, 194 (1954); *Fowler* v. *United States*, 154 F.Supp. 859, 862 (1957); 46 A.L.R.2d 636, § 4(a).

There is no question that the taxpayer's intention at the time of acquisition, although by itself is not a decisive and determinative factor, aids greatly in ascertaining whether he held primarily for the purpose of sale or for other purposes. See, in this connection, the article published in 2 Tax L. Rev. (1946), *"Dealing in Real Estate"* by Fink.

The evidence heard and believed by the trial court establishes to satisfaction that the purpose of Valldejuli Rodríguez in acquiring the properties was not for the purchase and sale of real estate. In acquiring the properties, the purposes sought were other than the resale, namely, agriculture and cattle raising.

And an examination of the record reveals unquestionably that that intention and purpose was objectively manifested by acts pointing to a conduct consistent with appellee's purpose at the time of acquiring the properties in question. Let us see: (a) Appellee lived with his family on the properties which he acquired from 1938 to 1944, and performed therein works essentially of an agricultural and cattle-raising character, such as the construction of a cow

stable and sowing of grass and truck gardening; (b) he took his two sons, who are agricultural engineers, to work with him on the properties lying in the Cayey-Cidra zone, which he acquired for the purpose of establishing an agricultural tenement. These properties had a sugarcane quota and, in fact, a great part of the land was devoted to sugarcane. He also established his residence therein, and for that purpose he constructed a house at a cost of $140,000; (c) he devoted the Isla Verde property which he acquired in 1951 to dairy-cattle raising; (d) he leased the Guaynabo property, which he acquired by exchange in 1954 for his Cayey property, to its former owner, Peñagarícano. The term of this lease was from three to four years; (e) he constructed a house on the property which he purchased in Vega Baja in 1954, where he moved his residence; (f) he leased to Radio Corporation of America part of the two adjoining properties which he acquired in the ward of Sabana Seca of Toa Baja between 1956 and 1957, and devoted the unleased part to cattle raising. He also established his residence therein. Furthermore, at the time of the hearing he still devoted them to those activities and lived therein; (g) the one-half interest in the Loíza property which he acquired in 1958 was still devoted to cattle and pasture at the time of the hearing.

It could hardly be argued that appellee's attitude during the time he held the described properties is tantamount to the usual and common attitude of one whose primary purpose is to sell what he has acquired by the incentive of the gain which he will obtain from such sale. "In general terms, it may be said that a 'dealer' is a person who is engaged in certain activities which constitute the ordinary operation of a business for which he acquires the property for the purpose of selling it later at a profit. On the other hand, an investor is one who acquires property *by reason of the income which it will yield rather than for*

*the profit which may be obtained in the resale.*" 1 Genovevo Meléndez Carruccini, *Manual de Ganancias y Pérdidas de Capital* 220 (1962). (Italics ours.) In this case the properties were purchased with the consistent purpose that they would produce income to their owner, but not for the primary purpose of resale and consequent obtainment of profits. There was no objective evidence of a change in that purpose. In *Goldberg* v. *Comm.*, 223 F.2d 709, 712 (1955), it was said:

". . . If the property was originally acquired for rental purposes, it may nevertheless later be held for ordinary business sale to customers, and the converse may also be true. But the original purpose is important, for to counterbalance it there must be significant objective evidence of a change in that purpose."

The sale by appellee of most of his properties by the acceptance of reasonable offers does not render him a real-estate dealer. In *Austin* v. *United States*, 116 F.Supp. 283, 286 (1953), the court said:

". . . In my opinion, a taxpayer may maintain an attitude of willingness to sell, and may in fact sell and liquidate his own long-held assets, in the absence of any other indicia of real estate activity, without thereby becoming engaged in the real estate business; and this be true whether the amount so sold be large or small. This is the type of fact situation which Section 117 was designed to cover."

We are in complete accord with the statements made in *Austin*. That is why we believe that appellee's conduct and his testimony to the effect that he accepted offers whenever they represented some good transaction does not conflict with the condition of "investor." Such fact cannot establish by itself that he held the properties primarily for resale. The attitude maintained by Valldejuli Rodríguez is but the usual attitude which a normal and common man would maintain under similar circumstances.

In order to be excluded from the range of the definition of "capital assets" of § 117 of the Act, it is not enough to show that property is held primarily for sale. It is also necessary to establish that it is held for sale "in the ordinary course of business." And in determining whether the taxpayer is engaged in the real-estate business for the purposes of that section, the courts have considered primarily the extent of the sales activities carried out by the taxpayer, the frequency and continuity of the transactions, the length of time devoted to each particular activity, etc. 46 A.L.R.2d 649, 656, 657; *Thomas* v. *Wood*, 16 T.C. 213, 226 (1951).

Let us now consider the first factor mentioned— the taxpayer's sales activities. The method of disposing of the property is therefore most significant. In this connection, all these measures aimed at soliciting purchasers carry great weight. Weithorn, *"Dealer"* v. *"Investor" Problem*, 11 Tax L. Rev. 157 (1956). Among those activities are the improvements made to the property for the purpose of soliciting customers, circulation of price listings, erection of signs that the property is for sale, the solicitation of potential customers, the publicity carried out through advertisements in the newspapers, the maintenance of sales offices, and the like. The greater the activities, the greater the probability of classifying him as a real-estate dealer. *Palos Verdes Corp.* v. *United States*, 201 F.2d 256 (1952); *Friend* v. *Comm.*, 198 F.2d 285, 287, 289 (1952); *King* v. *Comm'r*, 189 F.2d 122, 124 (1951); *Galena Oaks Corp.* v. *Scofield*, 116 F.Supp. 333, 335 (1953); *Boomhower* v. *United States, supra* (1947); *South Texas Properties*, 16 T.C. 1003, 1009 (1951); *Frieda J. Farley*, 7 T.C. 198 (1946). The evidence believed by the trial court establishes that the appellee, with the exception of the Hyde Park property, never built streets, sewers, nor any similar improvements; never campaigned or advertised for sales promotion, nor hired brokers to solicit purchasers.

He has fenced the property, constructed or reconstructed the same solely for residential purposes. In view of this state of facts, we cannot conclude that his conduct is what is commonly known as holding primarily for sale.

Appellant maintains that the trial court erred in disregarding the fact of the "frequency and continuity of the transactions" in real estate of the taxpayer.

■ The criterion of "frequency and continuity" of the transactions is closely associated with that of "sales promotion activities." 3B Mertens, Law of Federal Income Taxation 624; Pennell, Capital Gains in Real Estate Transactions, Tulane Tax Institute 35 (1959). It is not a conclusive factor by itself and its application depends on the result of other factors. *Lobello* v. *Dunlap*, 210 F.2d 465, 468 (1954). We must consider it in the light of the holding of the court in *Farley* v. *Comm.*, 7 T.C. 198, 202 (1946), cited in *Nolla* v. *Sec. of the Treasury, supra* at 726:

"Respondent contends primarily that the sales involved were so frequent and continuous as to constitute such activity a trade or business. It is unquestionably true that the frequency and continuity with which a particular activity is carried on is a primary consideration in determining whether such activity constitutes a trade or business. *It is significant to note, however, that the cases which have applied this test to real estate transactions involved elements of development and substantial sales activity which are essentially lacking in the instant case.* See *Richards* v. *Commissioner, supra; Snell* v. *Commissioner, supra; Welch* v. *Solomon, supra; Ehrman* v. *Commissioner, supra; Oliver* v. *Commissioner,* 138 F.2d 910; *Gruver* v. *Commissioner, supra; Brown* v. *Commissioner, supra; James Lewis Caldwell McFadden,* 2 T.C. 395. In none of these cases did the taxpayer maintain the passive posture held by petitioner in the instant case." (Italics ours.)

Similar language is employed in *Goldberg* v. *Commissioner*, 223 F.2d 709, 712 (1955):

" . . . How frequent the sales are depends on many circumstances; the extent to which the seller turns his talents to the promotion and solicitation of sales, the number of units in the rental project, and the state of the market. Only the first of these circumstances has any rational connection with the question whether the owner has changed his business to selling, or simply liquidating his business. *Thus the frequency and continuity of sales factor is significant only so far as it reasonably justifies the conclusion that the owner somehow promoted the sales.*" (Italics ours.)

■ Therefore, in the absence of the sales activities to warrant the application of the "frequency and continuity" test, we believe that the trial judge acted correctly in disregarding it. However, by this we do not mean to say that the absence of sales activities necessarily implies in any event a capital gain treatment. As stated at the outset, we must examine the facts as a whole in each particular case. The "frequency and continuity factor" in a given case, considered in connection with other factors, and even in the absence of the sales activities, may be so overpowering as to make it compulsory to treat the gain as ordinary income. The absence of sales activities may not be a determinative factor, for example, where the demand for the property in question is so great that promotion sales activities are rendered unnecessary. 46 A.L.R.2d 669, 670.

 The factor of time devoted by the taxpayer to the activity or enterprise in question is closely associated with the factors discussed hereinabove. "The more time and effort devoted to real-estate sales, the less probabilities of establishing the category of investor." Genovevo Meléndez Carruccini, *op. cit. supra* at 228. This does not mean that the taxpayer's real-estate business should be the only one, his principal business inclusive. On the contrary, "he may be in other businesses to which he devotes more time and money than to his real-estate transactions and still come within the rule

that his sales were in the ordinary course of his business." *Nolla* v. *Sec. of the Treasury, supra* at 724.

However, that is not the situation here. Appellee at all times has practiced the legal profession and, although it is true that he has not devoted all his time to that activity, it does not appear from the evidence either whether he devoted the rest of the time to the real-estate "business." Considering the little, or lack of, activity in sales promotion, the time devoted by him, and which he continued to devote, at the time of the hearing of the case in the Superior Court, to agriculture and cattle raising, the absence of a "dealer's" license or any other element indicative that he acted or represented himself as a "dealer," and the absence of substantial improvements to the properties acquired for the purpose of rendering them saleable to the purchasers, we are bound to conclude that the sales were not transacted as part of a "business." We believe, on the contrary, that the sales were rather occasional and isolated, transacted as events incidental to the agricultural and cattle-raising activity in which the appellee was primarily engaged. It is proper to point out what the court said in *Snell* v. *Commissioner*, 97 F.2d 891, 892 (1938):

". . . An occasional sale of land held as an investment is not such a business though profit results. The word, notwithstanding disguise in spelling and pronunciation, *means busyness; it implies that one is kept more or less busy, that the activity is an occupation.* It need not be one's sole occupation, nor take all his time. It may be only seasonal, and not active the year round. *It ordinarily is implied that one's own attention and effort are involved."* (Italics ours.)

The same rule is reiterated in *Fahs* v. *Crawford*, 161 F.2d 315, 317 (1947), by the expression which we copy:

"Of course, a person may be engaged in more than one business, and may carry on his business through others. *Carrying on a business, however, implies an occupational undertaking*

*to which one habitually devotes time, attention, or effort with substantial regularity.* Merely disposing of investment assets at intermittent intervals, without more, is not engaging in business, even though some preliminary effort is necessary to render the asset saleable." (Italics ours.)

■ In support of the foregoing, and at the same time another factor which we ought to consider, is the proximity of the purchase of the property and its subsequent sale. Fink, *"Dealing in Real Estate,"* 2 Tax L. Rev. 111, 118 (1946). In our judgment, the trial court acted correctly in determining that "plaintiff held his properties during a period in excess of that which a real-estate broker holds those which he acquires for resale." In 1949 he sold to the Housing Authority the remainder of the Sabana Llana properties which he acquired during the period from 1938 to 1944, that is, he held them for a period of not less than five years; in August 1953 he sold the Isla Verde property which he acquired on March 26, 1951, or approximately 2 years and 4 months later; in 1958 he sold the Guaynabo property, having held the same during four years since he acquired it in 1954; in 1957 he sold to Martorell the Vega Alta property which he acquired in 1954, so that he held it for about three years; in 1954 he exchanged to Peñagarícano the property which he had held during the period from 1945 to 1949, making a holding period of approximately five years. The length of time elapsed from acquisition until disposition of the properties is clearly indicative of an attitude which is not common in one who acquires properties for the purpose, made manifest during the holding period, of selling later at a profit.

■ It should be pointed out further that, as respects the properties involved in the deficiencies under consideration, compliance was had with the requirement of holding for more than six months provided by § 117(a)(4) which defines long-term capital gain.

44

█ █ The circumstances present at the time of the sale is another factor which serves as a guidepost in ascertaining whether the property was held primarily for sale to customers in the course of business. Levin, *Capital Gains or Income Tax on Real Estate Sales*, 37 B.U.L. Rev. 165, 194, 195 (1957). The author cites several cases in which the taxpayer is compelled to sell the property by external circumstances, thereby rendering the transaction involuntary and meriting capital gain treatment instead of ordinary income. Thus, for example, the sale forced by a threat of condemnation has been deemed a determinant factor in ascertaining that it has not been held primarily for sale. See *Maudine Neese*, T.C.Dkt. No. 35402 of September 16, 1953; *W. B. Malouf*, T.C.Dkt. Nos. 36882 and 36883 of June 30, 1955.

█ Let us examine the particularities surrounding the property sales under consideration. For fear of further condemnation, the taxpayer sold the remainder of the Sabana Llana property, part of which was taken by the Housing Authority, to the same institution. The uncontroverted testimony of appellee reveals that the Housing Authority had apprised him of the need for condemning the remainder. We believe that such fear was founded in view of the demands of that entity: he sold to Tió and Emanuelli all the lands of the properties lying in the Cayey-Cidra zone which were devoted to sugarcane because his two sons, whom he had taken to work with him, had left and he was unable to attend to it himself; he exchanged the remainder of the properties above described for another property in Guaynabo because the land had become a "white elephant" when he was left without a sugar quota as a result of the sale made to Tió and Emanuelli; he decided to sell the Isla Verde property because he thought that the tax deficiency served on him was unfair, and planned to sell all his properties and leave Puerto Rico; he was prompted to sell the Guaynabo property

by a highly profitable offer which netted a profit of $500,000; he was prompted to sell the Hyde Park property, which was the only one he urbanized for the sale of lots, by a series of annoyances which prevented him from residing therein after making several efforts to that end. Such annoyances inconvenienced the lease of the property which he had executed in favor of Nevares, and also rendered it unsaleable to the Insular and to the Municipal Government.

In brief, with the exception of the sale which netted a profit of $500,000, each one of the transactions carried out was surrounded by circumstances alien to taxpayer-appellee which give the transaction a ring of involuntariness. That factor undoubtedly affects adversely a determination to the effect that the property is held primarily for sale. It cannot be the intention of the lawmaker in enacting § 117 that the taxpayer be obligated to hold the property regardless of the contingencies which may arise, or even more, when they actually arise, without being able to dispose of it, and this on pain of his being excluded from the capital gain benefit. He may adopt those measures which may be necessary for his protection as well as for that of the property. Among those measures is the disposition of the property, without affecting his condition of investor.

Another fact in favor of a capital-gain treatment which we cannot fail to mention refers to two items in which appellee was granted the benefit which he now claims. The capital-gain benefits were granted to him in the sale of the remainder of the Sabana Llana property which he made to the Housing Authority. He also obtained that benefit in the $500,000 gain which he realized in the sale of the Guaynabo property.

The conclusions of the trial judge are based on the evidence, as revealed by the record as a whole; they represent the most rational, fair and juridical balance in the solution

of the case, and for that reason they are not clearly and manifestly erroneous.

The judgment appealed from will be affirmed.

