NOTICE

Decision filed 09/28/06. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NO. 5-04-0571

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | |
|---|---|
| SIERON & ASSOCIATES, INC., E.J. SIERON, E. JOHN SIERON, ARROW REALTY, INC., TUJAY, INC., GOLDEN PROPERTIES, INC., OFS, LTD., HAWK PROPERTIES, INC., FALCON, LTD., JMW, INC., THERESA SIERON, and SCOTT SIERON, | ) Appeal from the ) Circuit Court of ) St. Clair County. ) ) ) |
| Plaintiffs-Appellants, | ) ) |
| v. | ) No. 03-MR-193 ) |
| THE DEPARTMENT OF INSURANCE, ANTHONY CLARK, Director of Insurance, THE ILLINOIS FAIR PLAN ASSOCIATION, and DOUGLAS A. JENSEN, General Manager of the Illinois FAIR Plan Association, | ) ) ) ) ) |
| | ) Honorable ) Richard A. Aguirre, |
| Defendants-Appellees. | ) Judge, presiding. |

_____

JUSTICE McGLYNN delivered the opinion of the court:

## I. INTRODUCTION

In May of 2002, the Illinois FAIR Plan Association Governing Committee voted not to renew all insurance policies that insured properties held by one of the largest property owners in Metro East Illinois–the Sierons. Members of the Sieron family and companies closely held by them (the Sierons) own or control some 650 to 700 single-family houses, mostly in the impoverished area of East St. Louis. Because the properties held by the group had an unusually high loss ratio, the FAIR Plan Association decided not to renew any of the Sierons' policies. The Sierons appealed the nonrenewals to the Director of Insurance, who, after an administrative hearing, entered an order affirming the FAIR Plan Association's

1

nonrenewal of the Sieron policies. The Sierons then filed an administrative review action in circuit court, and on August 16, 2004, the trial court affirmed the order. The Sierons now appeal, arguing that the FAIR Plan Association's decision not to renew their insurance policies violates the Illinois FAIR Plan (see 215 ILCS 5/522 *et seq.* (West 2004)), is against the manifest weight of the evidence, is constitutionally invalid, and is contrary to law.

## II. HISTORICAL ANALYSIS OF THE INNER CITY

## INSURANCE CRISIS

In the mid-1960s, the manner in which insurance rates were set, as well as the prevailing business model for property insurers, led the insurance industry to conclude that underwriting properties in the urban core was uneconomical at the rate classifications approved by state insurance rating bureaus. *The Central City Insurance Crisis: Experience Under the Urban Property Protection and Reinsurance Act of 1968*, 38 U. Chi. L. Rev. 665, 666 (1971). This fear was heightened by projections of the potential for massive losses in the event of a catastrophic civil disturbance in urban areas. 38 U. Chi. L. Rev. at 666. The system of rate regulation common to most states required insurers to submit fixed rate schedules for the various classes of property insurance. 38 U. Chi. L. Rev. at 666. Since all properties within a given classification were charged the same rate regardless of risk, the insurance companies were willing to insure only those properties that would be profitable at the given rate. 38 U. Chi. L. Rev. at 666 n.6 (citing *President's National Advisory Panel on Insurance in Riot-Affected Areas, Meeting the Insurance Crisis of Our Cities*, 1, 33 (1968) (*The Hughes Report*)). When the risks in a specific area or neighborhood appeared to be riskier and therefore demanded rates greater than the applicable rate schedule allowed, insurers withdrew from the area. 38 U. Chi. L. Rev. at 666.

Compounding the problem was that if a major insurer actively sought to write policies in the urban core, the increased claim payments in those areas required the insurer to increase

2

overall premium rates. 38 U. Chi. L. Rev. at 666. This rise in premium rates would eventually price the insurer out of the lower-risk markets and force it to raise its rates even more, due to the higher loss ratio. 38 U. Chi. L. Rev. at 666. The natural progression of this dynamic was that the insurance industry gradually divided itself into two categories: standard companies competing for better risks, which excluded most urban, minority neighborhoods, and second-line companies of questionable solvency, which offered insurance at an increased rate to high-risk properties that major companies refused to insure. 38 U. Chi. L. Rev. at 666. This additional cost was either prohibitive to the property owners or forced businesses to pass the costs on to their local customers. 38 U. Chi. L. Rev. at 668. This resulted in tightly grouped buildings with segregated, dissatisfied residents who were mostly minorities. 38 U. Chi. L. Rev. at 667 n.10 (citing *The Hughes Report* at 6).

Standard property insurers developed several tactics to restrict the number of policies their agents could or would write in these high-risk central-city areas. 38 U. Chi. L. Rev. at 667. One of the most effective methods was "redlining"–a nefarious ploy in which the insurer designated specific areas as unqualified for any coverage or for only certain limited coverage. 38 U. Chi. L. Rev. at 667. Typically, entire neighborhoods were "redlined," without regard to the intrinsic characteristics of individual properties within the area. 38 U. Chi. L. Rev. at 667. There were other tactics and strategies to be sure, all of which had the effect of either defeating coverage or setting very high deductibles or extremely low coverage-to-value ratios. 38 U. Chi. L. Rev. at 667.

The unavailability of reasonably priced property insurance had a twofold effect. 38 U. Chi. L. Rev. at 668. First, businesses and shop owners were forced to pass their increased costs on to their customers. 38 U. Chi. L. Rev. at 668. This led to " 'resentment and tensions between merchants and neighborhood residents, who believe[d] they [were] being victimized by profiteering and unethical business practices.' " 38 U. Chi. L. Rev. at 668 (quoting

*Hearings on 1970 Housing and Urban Development Litigation Before the Subcomm. on Housing of the H. Comm. on Banking and Currency*, 91st Cong., 2d Sess., pt. 1, at 382 (1970) (statement by Thomas J. D'Alesandro III, Mayor, Baltimore, Md.). The second and more profound effect of the unavailability of reasonably priced property insurance was to accelerate urban decay and abandonment. 38 U. Chi. L. Rev. at 668. Since "redlining" was becoming commonplace in the mid-1960s and financing for new developments and the rehabilitation of older structures were simply impossible without adequate insurance coverage, our nation discovered that unless all urban property owners were insured against loss, attempts at urban rehabilitation and revitalization were doomed to fail. 38 U. Chi. L. Rev. at 665 at 665, 668.

## III. THE CONGRESSIONAL RESPONSE AND CREATION OF THE FAIR PLAN

Because private insurers were unlikely to insure those areas, Congress enacted the Urban Property Protection and Reinsurance Act of 1968 (Pub. L. No. 90-448, §1101, 82 Stat. 555) to assist states and the insurance industry in making essential property insurance more readily available to urban areas. 38 U. Chi. L. Rev. at 669.

Soon after, Illinois enacted its own urban property insurance statute within the Illinois Insurance Code, and the purpose of this statute is stated as follows:

"This article is to make basic property insurance increasingly available to the citizens of this State, and to deter the insurance industry from geographically redlining urban areas of this State by requiring the restructuring of the Industry Placement Facility and administering the FAIR Plan (Fair Access to Insurance Requirements) to deliver residential property insurance to all citizens of this State on a reasonable access and marketing basis by offering homeowners insurance, by requiring immediate binding of eligible risks, by making use of premium installment payment plans, and by further establishing reasonable service standards in its plan of operation

4

subject to the approval and review of the Director; and[] to establish a central operation facility for the equitable distribution of losses and expenses in the writing of the basic property insurance and homeowners insurance in this State." 215 ILCS 5/522 (West 2004).

In other words, the State of Illinois enacted the FAIR Plan to provide basic and affordable fire and homeowners property insurance to qualified applicants in urban areas who are unable to purchase coverage through the standard insurance market for reasons beyond their control. 215 ILCS 5/522 (West 2004). Thus, at-risk and low-income urban markets would be insulated from rampant noncoverage or redlining.

Under the FAIR Plan, property owners may apply for FAIR Plan insurance coverage if at least three other insurance agencies have refused to insure their property. 215 ILCS 5/524(1) (West 2004). Given this basic requirement, the FAIR Plan is considered a market of last resort. Even so, it is important to note that not all property owners are entitled to insurance. Basic underwriting insurance standards still apply. 215 ILCS 5/524(5) (West 2004). If the property is simply not an insurable risk, the FAIR Plan is not required to issue or renew a policy of insurance. 215 ILCS 5/524(5) (West 2004).

It is with this historical perspective that we evaluate the FAIR Plan Association's decision not to renew all the Sieron policies. At first blush, the FAIR Plan Association's actions seem rather extreme given that every Sieron property had previously met the underwriting standards of the FAIR Plan and, presumably, had been subjected to a FAIR Plan property inspection. In fact, one or more of the Sieron entities were authorized to sell or bind FAIR Plan policies.

IV. INSURING THE SIERONS' PROPERTIES

Individually and through closely held businesses, the Sierons own or have an interest in more than 650 single-family houses. These houses are located within the communities the

5

FAIR Plan was specifically created to insure.

As stated above, an administrative hearing was held after the FAIR Plan decided not to renew any of the Sierons' insurance policies. At the hearing, Ed Sieron testified that for more than 50 years, the Sierons and Sieron entities have bought "depressed properties" from mortgage companies, banks, and foreclosure auctions and have sold them to individuals on a contract-for-deed basis. When buying a property under a typical contract-for-deed arrangement, an agreement is reached that the property may be bought if the intended buyer first makes all the payments and complies with all other contractual obligations. In other words, the Sierons retain the title to the property, and the "buyer" does not accumulate any monetary equity in the property until the last payment is made. If at any time the "buyer" fails to make a payment, the Sierons can repossess the property and resell it. Although the Sierons still own the property, Sieron & Associates, Inc., collects a fee for the "sale." Moreover, the "buyer" must make most of the repairs on the property, and the "buyer" must pay all the taxes and all the insurance premiums. To that end, most "buyers" obtain insurance through Sieron & Associates, Inc., which secures insurance on these properties, for a commission of 10%, through the FAIR Plan.

In 1998, Douglas Jensen became the FAIR Plan's general manager and began investigating the FAIR Plan's fire losses, which composed about 80% of the total claim payments made by the FAIR Plan. After researching the claims data, Jensen found that the East St. Louis area had the largest number of fire losses in the state. He also found that the policies placed through Sieron & Associates, Inc., had loss ratios of 517%, 434%, and 586% for 1999, 2000, and 2001. In almost every instance of loss, a Sieron individual or entity owned the property for which Sieron & Associates, Inc., had obtained insurance. In comparison to other East St. Louis area properties insured by the FAIR Plan, the Sieron properties had loss ratios that were four to five times higher than the loss ratios for similar

6

properties that were not owned by a Sieron entity.

Given this loss ratio, the FAIR Plan determined that the susceptibility to loss for properties owned by Sieron entities was "unusually high" for the risks involved "because the applicant or a beneficial owner of the property [(the Sierons)] has a history of losses substantially in excess of what would normally be anticipated." Therefore, on May 8, 2002, the FAIR Plan Association Governing Committee voted unanimously not to renew all the policies for which a Sieron entity was the applicant and/or a beneficial owner of the property. At the hearing, the Sierons offered no evidence to dispute that their losses were excessive. In fact, Ed Sieron testified that he agreed that the losses were too high, but he stated: "We don't have control over it. Once we sell the property to the person, they have control over it."

After hearing all the evidence presented, the Director of Insurance entered an order affirming the FAIR Plan Association's nonrenewal of the Sieron policies. The Sierons then filed an administrative review action in the circuit court, and on August 16, 2004, the trial court affirmed the order.

## V. THE SIERONS' APPEAL

The Sierons argue that the FAIR Plan Association's decision not to renew their insurance policies violates the Illinois FAIR Plan, is against the manifest weight of the evidence, is constitutionally invalid, and is contrary to law. When reviewing a final administrative decision, we review the record before the administrative agency and defer to the agency's factual findings as *prima facie* true and correct. 735 ILCS 5/3-110 (West 2004).

In their first point on appeal, the Sierons argue that the FAIR Plan Association's decision not to renew their insurance policies fails to comply with the Illinois FAIR Plan, specifically, section 524 of the Illinois Insurance Code (215 ILCS 5/524 (West 2004)). We disagree. Section 524 simply does not apply to the Sierons' situation. Section 524 establishes a procedure under which individuals who are applying for insurance through the

7

FAIR Plan *for the first time* may receive an inspection of their property and a written report of whether the property meets the reasonable underwriting standards established under the FAIR Plan, in section 525 of the Illinois Insurance Code (215 ILCS 5/525 (West 2004)). As detailed above, however, inspections to determine initial FAIR Plan insurance eligibility are not at issue here. The FAIR Plan Association's actions being challenged here involve the nonrenewal of existing policies upon their expiration. There are no conclusions of property inspectors at issue here, and section 524 simply says nothing regarding the renewal or nonrenewal of existing FAIR Plan policies.

Under the urban property insurance statute, FAIR Plan insurance is to be issued according to "reasonable underwriting standards for determining insurability of a risk, subject to the approval of the Director [of Insurance]." 215 ILCS 5/525 (West 2004). In order to comply with this directive, the FAIR Plan Association's articles of incorporation and plan of operation, which detail the FAIR Plan's underwriting procedures, have been approved by the Director of Insurance. According to the articles of incorporation, "No policy issued by the Association shall be canceled or refused renewal except *** on grounds *which would have been cause for non*[]*acceptance of the risk if they existed and had been known at the time of acceptance*." (Emphasis added.) Articles of Incorporation of the Illinois FAIR Plan Ass'n, art. XIII(L)(1)(a) (amended July 27, 1995). Moreover, the FAIR Plan may find a risk unacceptable where "the susceptibility of the property to loss *** is unusually high for the type of risk involved *** because the applicant or a beneficial owner of the property has a history of losses substantially in excess of what would normally be anticipated." Illinois FAIR Plan Ass'n Plan of Operation, §V(1) (revised March 2002).

In this case, there is no question that the FAIR Plan loss history associated with the Sieron properties is unusually high for the type of risk involved when compared to similar properties in the area that are not owned by the Sierons. Since the FAIR Plan Association is

8

allowed not to renew on any ground that would have been a cause for the nonacceptance of the risk had the reason existed at the time the application was accepted and the Sierons' FAIR Plan loss history has proven to be four to five times higher than the loss ratios for similar properties that are not owned by a Sieron entity, we find no error in the FAIR Plan Association's nonrenewal of all the Sieron insurance policies. It is clear that had the Sierons had such a loss history when they applied for FAIR Plan insurance, this would have been an unusually high loss history and an unacceptable and uninsurable risk. Accordingly, we find that the FAIR Plan Association's decision not to renew the Sieron policies complies with the FAIR Plan statute and the approved underwriting standards.

In their second point on appeal, the Sierons make a slew of general arguments regarding the FAIR Plan Association's decision not to renew their FAIR Plan insurance policies. To summarize, they argue that the decision (1) is against the manifest weight of the evidence, (2) is constitutionally vague, (3) failed to afford them due process, (4) "redlines" East St. Louis, (5) improperly pierced the veils of various corporate plaintiffs, and (6) is the result of the Director of Insurance's inherent conflict of interest. We disagree and address each of these arguments in turn.

First, we find that the Sierons made no citations to the record to support their argument that the decision is against the manifest weight of the evidence. Absent supporting citations to the record, we need not consider the argument. See *Central Illinois Public Service Co. v. Illinois Commerce Comm'n*, 219 Ill. App. 3d 291, 300, 579 N.E.2d 1200, 1206 (1991). However, our own review of the record demonstrates more-than-ample evidence to support the finding of the Director of Insurance. In fact, scant evidence exists that points in a direction other than toward the conclusion drawn by the FAIR Plan Association. Moreover, we are bound by our standard of review, which obliges us to take the agency's findings as *prima facie* true and correct (735 ILCS 5/3-110 (West 1994)).

9

Next, the Sierons argue that the decision is unconstitutionally vague because "the Administrative Law Judge and the Director of Insurance made a finding that if your name is Sieron or if a Sieron is a shareholder in a corporation that [*sic*] the Illinois FAIR Plan will not insure the underlying property under any circumstances, irrespective of the property's physical condition."  This is simply not the case.  The Director of Insurance affirmed the FAIR Plan Association's decision *not to renew existing policies*.  Whether a Sieron or Sieron entity could obtain FAIR Plan insurance upon reapplication is not at issue in this appeal.  Moreover, there is nothing vague about the FAIR Plan Association's decision–the association will not renew any existing Sieron or Sieron entity policy.  This group of Sierons is not vague; it is limited to those who were once insured by the FAIR Plan and parties in the underlying cause.

The Sierons next argue that they were not afforded due process before the FAIR Plan Association decided not to renew their policies or before the Director of Insurance affirmed the FAIR Plan Association's decision.  We disagree.  First, we find that the Sierons were not entitled to be involved in the FAIR Plan Association's initial decision not to renew the Sierons' policies.  Although mandated by the State of Illinois, the FAIR Plan Association is an insurer, and the Illinois Insurance Code merely requires it to notify an insured of its intention not to renew a policy at least 30 days before the policy expires (215 ILCS 5/143.17(a) (West 2004)).  If an insured wants to challenge the nonrenewal, the insured may appeal to the Director of Insurance.  215 ILCS 5/143.23 (West 2004).  In this case, the Sierons appealed and the Director of Insurance appointed an administrative law judge, who conducted a hearing in which the Sierons presented witnesses and evidence.  This hearing clearly afforded the Sierons due process before the Director of Insurance affirmed the FAIR Plan Association's decision.  Thus, we find no deprivation of due process at either stage of the case.

10

The Sierons next allege that "[t]he Illinois FAIR Plan and the Department of Insurance have now redlined between 650 and 700 homes in the 62201 zip code also known as East St. Louis." We take the allegation of "redlining" very seriously. Having outlined the historical definition and practice of "redlining" targeted for elimination by Illinois's statutory scheme, we see neither *de jure* nor *de facto* "redlining" in this matter. The Sierons make no citation to the record to support the allegation, and this court's review of the record finds none. The evidence shows that the FAIR Plan Association continues to insure properties in East St. Louis but merely has chosen not to insure Sieron properties.

The Sierons next argue that the FAIR Plan Association improperly pierced corporate veils by deciding that if an insured corporation has a Sieron as a shareholder, "no insurance is afforded through the FAIR Plan." The Sierons use this term of art too loosely; the FAIR Plan did not pierce the veil of any corporation. It simply decided not to renew insurance policies on properties owned by Sieron entities because they have an unusually high loss history.

Next, the Sierons allege that the Director of Insurance had an inherent conflict of interest by reviewing the decision of the FAIR Plan Association after he had appointed the FAIR Plan Association Governing Committee himself. However, the Sierons failed to raise this issue at the administrative hearing or in their complaint for administrative review. If an argument is not presented in an administrative hearing or in the complaint for administrative review, that argument is waived. *North Avenue Properties, L.L.C. v. Zoning Board of Appeals of the City of Chicago*, 312 Ill. App. 3d 182, 187, 726 N.E.2d 65, 70 (2000). Therefore, the Sierons have waived this argument.

## VI. APPLICATION OF THE RULING TO THE BUYERS

Before concluding, we feel compelled to address a class of individuals in this case that the FAIR Plan was designed specifically to protect–the people who actually live in the insured properties or the contract buyers of the Sierons' properties.

11

As a general rule, where the buyer under an installment contract for the sale of realty agrees to insure the property against casualty loss for the benefit of the seller, as the buyers in this case have done pursuant to the bond-for-deed contracts, the seller is entitled to the insurance proceeds to the extent of his interest in the insured property. *West Bend Mutual Insurance Co. v. Salemi*, 158 Ill. App. 3d 241, 246, 511 N.E.2d 785, 787 (1987). Conversely, the buyer is entitled to insurance proceeds to the extent of his interest in the insured property. Therefore, if the buyer has made any payments on the contract, he has an insurable interest. Thus, the contract buyers are entitled to obtain insurance in their own name.

Evidence in the record demonstrates the FAIR Plan Association's acknowledgment of this fact. The record shows that when the Sierons' FAIR Plan insurance policies were not renewed, many of the buyers and occupiers of the properties wrote letters appealing the FAIR Plan Association's decision. In response, the FAIR Plan Association stated as follows:

"While the FAIR Plan is willing to continue to insure you, as an additional insured, it is unwilling to do so as long as [the Sieron entity] is also shown on the policy as the named insured. Thus your present appeal is denied. If you wish to *reapply* for insurance, and if [the Sieron entity] is no longer to be listed as either the named insured or an additional insured, then the FAIR Plan will be able to issue a policy upon receipt of a new application and assuming the property continues to meet our underwriting requirements." (Emphasis added.)

Accordingly, we *clarify* that if any contract buyer has *any* insurable interest in a Sieron property, the buyer cannot be denied FAIR Plan insurance coverage on the property upon reapplication simply because of the claims history of the Sierons or because the Sierons, too, have an interest in the property. We reiterate that the Illinois FAIR Plan is meant to insure people who are unable to purchase coverage through the standard insurance market for reasons beyond their control. Lumping the loss history of the Sierons in with the

12

buyers–the people who are actually living in these houses–would leave the buyers uninsured and unfairly negates the purpose of the FAIR Plan. There are less draconian ways for the FAIR Plan Association to accomplish its goals than to deny good-faith applicants, without a questionable loss history, from securing coverage.

## VII. CONCLUSION

For the foregoing reasons, we affirm the decision of the trial court that affirmed the decision of the Director of Insurance affirming the FAIR Plan Association Governing Committee's decision not to renew the existing FAIR Plan insurance policies of the Sierons and Sieron entities. We *clarify*, however, that if any contract buyer has *any* insurable interest in a Sieron property, the buyer cannot be denied FAIR Plan insurance coverage on the property upon reapplication simply because of the claims history of the Sierons.


Affirmed.


JUSTICE GOLDENHERSH and JUSTICE CHAPMAN, specially concurring:

We reluctantly concur with the decision in this appeal and write the following to explain that reluctance.

Our review of the decision at issue is an administrative review, and accordingly, the scope of our review is limited under the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2004)). In essence, the scope of appellate review under the Administrative Review Law is limited to assessing questions of the manifest weight of the evidence and the adherence to the applicable law, case or statutory.

Given this limited scope of review, we are faced with a situation inherent in the applicable statute that is contradictory and the source of this suit and adverse consequences generally. The legislative intent of the statute is to create the availability of property

13

insurance for individuals who would otherwise be incapable of obtaining insurance in the regular property insurance market. The legislative purpose is "to make basic property insurance increasingly available to the citizens of this State, *and to deter the insurance industry from geographically redlining urban areas of this State*." (Emphasis added.) 215 ILCS 5/522 (West 2004).

This court refers to a long history of deeming certain areas as uninsurable, commonly known as redlining. Imbedded in the statute, however, is the provision that the insurer, the FAIR Plan Association, deal only with those properties that meet the standards of the very market from which they were excluded, specifically, "applicants in urban areas whose property is insurable in accordance with reasonable underwriting standards" (215 ILCS 5/525(1) (West 2004)).

The effect of this language is to mandate standards in the regulation and operation of the FAIR Plan that, as a practical matter, prevent the FAIR Plan from achieving the legislative purpose for which it was created. The instant case is an example of this impairment of the legislature's intent by statutory provisions at odds with each other. Justice McGlynn's opinion properly notes that the statute, the FAIR Plan's articles of incorporation, and its plan of operation require adherence to generally accepted underwriting standards. However, the result, contrary to the legislature's intent noted above, is that the commercially hard to insure remain uninsured and an urban area is *de facto* redlined.

Courts are not legislatures and judges are not legislators. Given these statutory provisions and the evidence in this appeal, we cannot say that this court's decision is against the manifest weight of the evidence or contrary to law. The inherent contradiction in this statute, which is self-defeating regarding its legislative intent, is appropriately a matter for the General Assembly and not for this court. We urge the legislature to examine this statute, its applications, and its effects in light of express legislative intent and deal with the inherent

14

contradiction that exists.  We are sure that a *de facto* redlining of an urban area is not the intent with which the statute was passed and the FAIR Plan created.

For the reasons stated above, we specially concur.

NO. 5-04-0571

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| SIERON & ASSOCIATES, INC., E.J. SIERON, E. JOHN SIERON, ARROW REALTY, INC., TUJAY, INC., GOLDEN PROPERTIES, INC., OFS, LTD., HAWK PROPERTIES, INC., FALCON, LTD., JMW, INC., THERESA SIERON, and SCOTT SIERON, | ) ) ) ) ) ) ) | Appeal from the Circuit Court of St. Clair County. |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | No. 03-MR-193 |
| | ) | |
| THE DEPARTMENT OF INSURANCE, ANTHONY CLARK, Director of Insurance, THE ILLINOIS FAIR PLAN ASSOCIATION, and DOUGLAS A. JENSEN, General Manager of the Illinois FAIR Plan Association, | ) ) ) ) ) | Honorable Richard A. Aguirre, |
| Defendants-Appellees. | ) ) ) | Judge, presiding. |

_____

**Opinion Filed**:        September 28, 2006

_____

**Justices**:        Honorable Stephen P. McGlynn, J.

Honorable Richard P. Goldenhersh, J., and
Honorable Melissa A. Chapman, J.,
Specially Concur

_____

**Attorney for Appellants**        Alvin C. Paulson, Becker, Paulson, Hoerner & Thompson, P.C., 5111 West Main Street, Belleville, IL 62226

_____

**Attorneys for Appellees**        Lisa Madigan, Attorney General, State of Illinois, Gary Feinerman, Solicitor General, Timothy K. McPike, Assistant Attorney General, 100 West Randolph Street, 12th Floor, Chicago, IL 60601 (for the Department of Insurance and Anthony Clark)

James E. Betke, James E. Betke, P.C., 161 N. Clark Street, Suite 4950, Chicago, IL 60601 (for the Illinois FAIR Plan Association and Douglas A. Jensen)

_____