Melvin R. and Evelyn HANSCHE,
Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent-Appellee.

Raymond V. HANSCHE and Estate of
Margaret Hansche, Deceased,
Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent-Appellee.

Warren M. and Leona D. HANSCHE,
Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent-Appellee.

Nos. 71–1214, 71–1215 and 71–1216.

United States Court of Appeals,
Seventh Circuit.

March 16, 1972.

**430**

William F. Kolbe, Racine, Wis., for petitioners-appellants.

Johnnie M. Walters, Asst. Atty. Gen., Donald H. Olson, Atty., Tax Div., Dept. of Justice, Washington, D. C., Meyer Rothwacks, Thomas L. Stapleton, Donald H. Olson, Attys., Tax Div., Dept. of Justice, Washington, D. C., for respondent-appellee.

Before FAIRCHILD, PELL and SPRECHER, Circuit Judges.

PELL, Circuit Judge.

This appeal arises from a Tax Court judgment, the effect of which was that certain real estate was held primarily for sale to customers in the carrying on of a real estate business with the concomitant denial of capital gains treatment.[1]

Melvin, Raymond and Warren Hansche (the Hansche brothers), the wives of two of them and the estate of the deceased wife of the third filed petitions in 1969 with the Tax Court for redetermination of the Commissioner's assessment of additional income taxes for the taxable years 1964, 1965 and 1966.

The taxes in question were assertedly owed pursuant to 26 U.S.C. § 1221(1).

Turning to the factual situation before the Tax Court, we do so mindful that it is the entire factual pattern of this type of case which must govern. Nadalin v. United States, 364 F.2d 431, 439, 176 Ct.Cl. 1032 (1966).

The Hansche brothers purchased a farm of approximately 133 acres near Racine, Wisconsin in 1942. Two residence building sites and a wooded area not suitable for farming were sold shortly after the acquisition. The remaining 116 acres were farmed by the brothers until 1951 with a small portion of the farm being continued in farming by a lessee until 1954.

In 1943, the brothers entered into an agreement to assure that the acreage "would be an orderly development," which agreement contained use and construction restrictions and which recited, *inter alia*, that it was their intention ". . . to sell the aforesaid premises in parcels and for their benefit and for the benefit of their heirs. . . ."

In 1945, a partnership in which the Hansche brothers had placed the farm land employed professional surveyors to prepare a subdivision plot. This was not finally completed and of record until eight years later due to technical local governmental requirements and the fact that the brothers were not in "any particular hurry with respect to development of their property."

On November 4, 1953, the then property owners, being the brothers and the owners of the lots sold shortly after the original acquisition, replaced the 1943 restrictions by executing a new agreement. This in part provided that the plans for all dwellings had to be submitted to and approved by the Board of Regulations. The Board at all material times consisted of the three brothers only.

In 1955, the partnership verbally employed a real estate agent to sell lots on

---

1. The Tax Court's Memorandum findings of fact, opinion and decision are reported at 29 T. C.M. 1655 (1970).

a commission basis. A second real estate agent was similarly employed in 1962. Both brokers placed signs on the real estate and periodically advertised the lots in a local newspaper. All lot sales after 1953 were handled through real estate brokers.

From 1953 through 1966, the partnership spent $121,768.44 improving the subdivision. More than $100,000 of this amount was spent in the last five years in question. The expenditures were basically for sewers, surface drainage, water supply and streets.

On May 11, 1962, the Hansches entered into an agreement to "redefine the terms of their association." The original partnership agreement was amended by adding to the second paragraph, captioned, Business of Partnership, the clause: "*to own, buy, sell and trade in real* and personal *property* including commodities, securities, bonds, stocks and mortgages *as shall be appropriate from time to time.*" [Emphasis added.] The brothers had continued farming operations on other real estate owned by them subsequent to 1951 but all farming operations as such were discontinued in 1962.

When the brokers found interested prospects, they would "check them out" with one of the Hansches to see if the Board of Regulations approved of the proposed building plans. Nobody was ever turned down but there were several cases in which slight changes had to be made in the plans. The record does not indicate the terms of the oral agreements with the real estate brokers such as how sales prices were to be determined and there is no record indication that there was authority on the agent's part to fix the price of lots or the terms of sale. In this connection it must be borne in mind that the burden of proof in these proceedings was on the taxpayer. O'Dwyer v. Commissioner of Internal Revenue, 266 F.2d 575, 580 (4th Cir.), cert denied, 361 U.S. 862, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959).

During the period from 1955 to 1963, the partnership sold 35 lots but during 1964, 1965 and 1966, the taxable years in issue, 24 such lots or an average of eight per year were sold.

Using the average value of lots in 1965, the Tax Court found that the developed acreage had increased in value from $29,500 in 1945 to about $880,000 primarily as a result of improvements made by the taxpayer, since the average value of surrounding land had increased only about one-third that much.

Sometime during or prior to 1966, the partnership surveyed and prepared plans for the balance of the real estate here involved which had not been previously platted. The second plat was approved and officially filed on May 8, 1967.

During the three taxable years in issue the partnership reported income earned from the sale of lots in the involved area of over $109,000 as long term capital gain. This was the partnership's largest single source of income although other real estate activities and the sale of mink pelts each produced nearly comparable amounts of income in those years.

On the basis of the evidence including oral testimony and stipulations, the Tax Court made the following ultimate finding:

"Petitioners' partnership, Hansche Produce Company, was during 1964, 1965 and 1966 conducting a real estate business. During these years, it held the subdivided lots known as Pleasant Valley Estates for sale to customers in the ordinary course of that business."

In reaching this conclusion, the Tax Court rejected the taxpayers' contention that they were in fact merely liquidating a land investment and were therefore entitled to capital gains treatment. Of course, there is nothing illegal or improper in the ordinary case with such an endeavor, the Supreme Court having stated that a taxpayer is free to arrange his affairs in such a way as to minimize or altogether eliminate his tax

liability as long as it is done consistently with the Code. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935). However, the Supreme Court has been equally clear in stating that the capital gains provisions are to be read narrowly:

"But the capital-asset provision of § 117 [precursor of § 1221] must not be so broadly applied as to defeat rather than further the purpose of Congress. Burnet v. Harmel, 287 U.S. 103, 108, 53 S.Ct. 74, 76, 77 L.Ed. 199. Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by § 117 applies to transactions in property which are not the normal source of business income. It was intended 'to relieve the taxpayer from . . . excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions.' Burnet v. Harmel, 287 U.S., at 106, 53 S.Ct. 75. Since this section is an exception from the normal tax requirements of the Internal Revenue Code, the *definition of a capital asset must be narrowly applied and its exclusions interpreted broadly.* This is necessary to effectuate the basic congressional purpose." Corn Products Refining Company v. Commissioner of Internal Revenue, 350 U.S. 46, 52, 76 S.Ct. 20, 24, 100 L.Ed. 29 (1955). [Emphasis added.]

More recently the Court has added a further gloss on the construction of § 1221(1).

"The purpose of the statutory provision with which we deal is to differentiate bewteen the 'profits and losses arising from the everyday operation of a business' on the one hand (Corn Products Refining Co. v. Commissioner of Internal Revenue, 350 U.S. 46, 52, 76 S.Ct. 20, 24, 100 L.Ed. 29) and 'the realization of appreciation in val-

ue accrued over a substantial period of time' on the other. (Commissioner of Internal Revenue v. Gillette Motor Transport, Inc., 364 U.S. 130, 134, 80 S.Ct. 1497, 1500, 4 L.Ed.2d 1617.) A literal reading of the statute is consistent with this legislative purpose. We hold that, as used in § 1221(1), 'primarily' means 'of first importance' or 'principally.'" Malat v. Riddell, 383 U.S. 569, 572, 86 S.Ct. 1030, 1032, 16 L.Ed.2d 102 (1966).

The endeavor of taxpayers to realize the more favorable treatment has been the source of much written material at the appellate level.

■ Although each case must be decided on its own facts, the cases have provided the basic tests for application which have been summarized in a recent Tax Court case, William B. Howell, 57 T.C. No. 58 (January 31, 1972), 40 U.S. L.W. 2501, as follows:

"These tests include: (1) the purpose for which the asset was acquired; (2) the frequency, continuity, and the size of the sales; (3) the activities of the seller in the improvement and disposition of the property; (4) the extent of improvements made to the property; (5) the proximity of sale to purchase; and (6) the purpose for which the property was held during the taxable years."

Applying these tests in the case at bar it is noted without particular surprise that, as frequently is the case of litigation which has reached the appellate level, some of the factors or tests favor the position of the taxpayers and some that of the Commissioner.

Thus, in the Tax Court the taxpayers had contended that the increase in value over a number of years of holding was partly the result of increased industrial growth in and near Racine, Wisconsin. Here, the Tax Court observed that although the record did not disclose this growth there was no showing before the court that such growth, if it did exist, was to any extent accountable for the increased value of the land in question and

that as far as the record disclosed such industrial growth, if any, might have been detrimental to a near-by residential subdivision.

The Tax Court further stated the following:

"We think the appreciated value grew, not from the mere passage of time while the property was being held for liquidation purposes, but rather from the expenditure of both time and money by petitioners in the tiling and draining of the land, its subdivision into sizable lots, the advertisement of lots for sale to the public, the installation by petitioners of sewer and other residential facilities, including streets, the plat restrictions, and probably even more important, the insistence of petitioners acting as a Board of Regulation upon strict compliance with such restrictions. In short, we are convinced that the holding of Pleasant Valley Estates by petitioners after May 11, 1962, was not the passive holding of liquidating investors but was sufficiently aggressive to characterize their holding as the conduct of a business."

■ Whether this is an issue of law, United States v. Winthrop, 417 F.2d 905 (5th Cir. 1969), or one of fact calling for the application of the "clearly erroneous" standard, Sovereign v. Commissioner of Internal Revenue, 281 F.2d 830 (7th Cir. 1960), and Patrick v. Commissioner of Internal Revenue, 275 F.2d 437 (7th Cir. 1960), in reviewing the Tax Court decision, it is our opinion that the record as a whole shows a well conceived and successful plan to develop this land for sale to individual home owners. Although the Tax Court placed particular emphasis on the change in the partnership agreement in 1962, the plan may fairly be said to have antedated the change in the agreement.

■ While the Commissioner is not bound to accept a taxpayer's self-serving characterization of his activities, the Commissioner is not precluded from looking at the terms and words used by the taxpayer which reflect the true status and purpose of a transaction. *Compare:* Bazley v. Commissioner of Internal Revenue, 331 U.S. 737, 67 S.Ct. 1489, 91 L.Ed. 1782 (1947), and Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945). The Hansches' own characterization of their activities in the preamble to the 1943 restrictive agreement and the 1962 amendment to the partnership agreement was an adequate basis for the Tax Court to conclude that there was no abandonment of the intention from 1943 to the time in question.

On this appeal, the taxpayers place their principal reliance on the decision of this court in Voss v. United States, 329 F.2d 164 (7th Cir. 1964), contending that the substantial identity between *Voss* and the case before us is dispositive of the present case. Dr. Voss, a dentist, also owned farm real estate near Racine, Wisconsin, being 60 acres which he had acquired in 1929 and 1931. By 1950 the value of the land had depreciated drastically. Although he had been able to obtain a minimal flow of income by renting the property he had been unable to sell it.

In 1954, Dr. Voss asked a realtor to sell the property. The realtor attempted to do so without success and advised Dr. Voss it was impossible profitably to sell the real estate as an entire tract.

The realtor suggested and developed a plan for subdividing the property and, pursuant to broad oral delegation of power from Dr. Voss, the realtor had the land graded and streets, sewage facilities and water mains installed. He caused the land to be rezoned and annexed, and qualified it for Federal Housing Administration loans. All expenditures were paid out of gross sales proceeds so that the project was self-financing. The agent paid all advertising costs and received ten percent commission on all sales, five percent being as a broker's fee and five percent as a developing fee. The only activities of Dr. Voss in connection with the entire transaction seemed to have been the routine

execution of deeds to purchasers and the cashing of net proceeds checks sent to him periodically by the broker.

Taxpayers contend that inasmuch as it was stipulated in the present case that the development and sale of the property was handled exclusively by the realtors, the pure and simple issue was whether the Tax Court would follow this court's decision. We do not read the word "development" in the narrow style which taxpayers would have us do. It is true that the Hansches did not engage in commercial promotion or advertising, but over the years they had substantially engaged in subdivision development as that term is ordinarily construed. The lay seller of real estate very seldom engages in commercial promotion or advertising of property which he has placed in the hands of a broker for sale.

The mere recital of the factual situation in *Voss, supra,* shows the differentiation between that case and the one before us. As this court said in *Voss, supra,* at p. 166:

> "A taxpayer need not personally conduct real estate sales to be in the business; he may act through agents. Moreover, a taxpayer may not insulate himself from the acts of those whose efforts are combined with his in an endeavor to make a profit."

■ It is true that the real estate agents orally retained by the Hansche brothers were independent in the sense that they were acting as independent contractors but this is true of the ordinary real estate broker-owner relationship. The mere retention of an independent real estate broker does not per se take the case out of the broad first exception of 26 U.S.C. § 1221. It is not imperative that the final moving of the real estate from the owner to the customer need be done by the taxpayer. That the actual advertising sales activities are here not performed by the taxpayers does not mean that they were not holding the property "primarily for sale to customers in the ordinary course of [Hansches'] trade or business."

Also, we note in *Voss, supra,* at p. 167 this court distinguished the cases cited by the Government pointing out, *inter alia,* that in some of those cases the owner had set or controlled the price of the lots and was in close contact with the developer of the property. We have already adverted to the fact that the record in the case before us is silent as to who set the price of the lots and that the burden of proof in this connection was on the taxpayer. O'Dwyer v. Commissioner of Internal Revenue, *supra.*

The Tax Court did not refer to the *Voss* case in its memorandum findings of fact and opinion. However, it is clear from a reading thereof that the Tax Court was of the opinion that a different factual situation prevailed. Further, we note that in the taxpayers' motion to revise decision, the court's attention was specifically directed to *Voss* and thereafter the motion was denied. We find taxpayers' reliance on *Voss* is misplaced.

The taxpayers also contend in the alternative that should this court find the lower court erroneously imputed the acts of the agents to the taxpayer, then the cause should be remanded to the Tax Court for determination as to whether or not the acts of the taxpayers, excluding those of the agents, constituted the carrying on of a trade or business. However, our reading of the Tax Court's decision indicates that, while that court did consider the activities of the broker were legally the activities of the taxpayers, that court also found support for its decision in the activities of the Hansches themselves. In dealing with the increased value, the Tax Court stated the following:

> "We have concluded that this disparity in comparative appreciation is due primarily to the active conduct of petitioners in preparing the raw land of the Mecham Farm for sale and their efforts through their agents in effectuating sales. We cannot equate the appreciation in value and petitioners' activities with the passive holding of an investment for liquidation purposes."

Holding that the Tax Court reached the correct result on the basis of the evidence before it, we find no reason for remanding this case for any further determination on the isolated issue of the taxpayers' activities in connection with the property.

For the reasons hereinbefore set out, the judgment of the Tax Court is affirmed.

Affirmed.