T.C. Memo. 2015-19

UNITED STATES TAX COURT

SI BOO, LLC, BOO NOZ CORPORATION, TAX MATTERS PARTNER,
ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 174-11, 199-11,          Filed February 4, 2015.
459-11.

Phillip H. Hamilton and Ebony R. Huddleston, for petitioners.

Stephen A. Haller, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, Judge: These consolidated cases are partnership-level proceedings

under the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No.

---

[1]The following cases are consolidated herewith: S. I. Securities, LLC, Barrett Rochman Revocable Trust, Barrett Rochman, Trustee, Tax Matters Partner, docket No. 199-11; and Sabre Group, LLC, Barrett Rochman Revocable Trust, Barrett Rochman, Trustee, Tax Matters Partner, docket No. 459-11.

**[*2]** 97-248, sec. 402(a), 96 Stat. at 648, as amended. On December 3, 2010, respondent issued notices of final partnership administrative adjustment (FPAAs) to the Barrett Rochman Revocable Trust (Rochman Trust) as tax matters partner of S. I. Securities, LLC (S. I. Securities), for S. I. Securities' 2007 and 2008 taxable years. On December 13, 2010, respondent issued an FPAA to the Rochman Trust as tax matters partner of Sabre Group, LLC (Sabre), for Sabre's 2008 taxable year. Also on December 13, 2010, respondent issued FPAAs to Boo Noz Corp. as tax matters partner of SI Boo, LLC (SI Boo), for SI Boo's 2007 and 2008 taxable years.

The tax matters partners for S. I. Securities, Sabre, and SI Boo (sometimes collectively referred to as the entities) timely filed petitions for readjustment of the partnership items under section 6226(a)(1), and the cases were consolidated for purposes of trial, briefing, and opinion.[2] The issues for decision are (1) whether real estate properties that S. I. Securities, Sabre, and SI Boo sold during the years at issue were held primarily for sale to customers in the ordinary course of their trades or businesses; (2) whether the entities are allowed to report sales of these properties made by contract for deed under the installment method; and (3)

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*3] whether the entities properly reported net earnings subject to self-employment taxes.

## FINDINGS OF FACT

Some facts have been stipulated, and the stipulated facts and the accompanying exhibits are incorporated in our findings by this reference. When they filed their petitions, S. I. Securities, Sabre, and SI Boo had principal places of business in Illinois.

I.  Background of the Entities

S. I. Securities, Sabre, and SI Boo were organized in Illinois as limited liability companies in 2007, 2001, and 1999, respectively. During the years at issue and for Federal income tax purposes the entities were treated as partnerships and used the cash receipts and disbursements method of accounting.

During the years at issue both S. I. Securities and Sabre had the same two partners: the Rochman Trust and C Deck, LLC (C Deck), which owned a 66.67% and a 33.33% profit and loss interest, respectively, in S. I. Securities and Sabre.[3]

---

[3]The Rochman Trust is Barrett Rochman's grantor trust. Charles Decker controls C Deck.

[*4] In 2007 and 2008 SI Boo had two partners: Boo Noz Corp. and S. I. Securities, which owned a 75% and a 25% profit and loss interest, respectively, in SI Boo.[4]

## II. The Entities' Businesses

We begin by providing an overview of Illinois tax lien law, because S. I. Securities and Sabre participated in tax lien auctions throughout the State of Illinois during the years at issue. We then discuss S. I. Securities', Sabre's, and SI Boo's businesses.

### A. Overview of Illinois Property Tax Code

Under the Illinois Property Tax Code, see 35 Ill. Comp. Stat. Ann. 200/1-1 through 200/32-20 (West 2006), county tax collectors may offer to sell tax liens at public auctions after judgment has been rendered in favor of the county and against the properties for nonpayment of taxes, see id. sec. 21-190; Phx. Bond & Indem. Co. v. Pappas, 741 N.E.2d 248 (Ill. 2000). During these auctions to sell the judgment liens the participants will bid "penalty percentage" rates, ranging

---

[4]In 2007 Boo Noz Corp. was owned by the following persons or entities with the following percentages of ownership: John Bridges (40%), Barrett Rochman (32%), Charles Decker Revocable Trust (20%), and Kenny Rochman (8%). In 2008 the ownership in and ownership percentages of Boo Noz Corp. were the same except that the Rochman Trust, rather than Barrett Rochman, owned a 32% interest in Boo Noz. The Charles Decker Revocable Trust is Charles Decker's grantor trust.

**[*5]** from 18% to 0%, and the participant who bids the lowest penalty percentage rate is considered the successful bidder (referred to by statute as the purchaser). See 35 Ill. Comp. Stat. Ann. 200/21-215.  After the auction concludes, the purchaser of the judgment lien pays the county judgment holder of tax lien the delinquent taxes owed on the property as well as certain other costs and receives a certificate of purchase of tax lien from the county clerk.  See id. secs. 21-215, 21-250.  The owner of the certificate of purchase of tax lien may assign it by endorsement, see id. sec. 21-250, and the county clerk's issuance of a certificate of purchase of tax lien does not affect the tax delinquent property owner's legal or equitable title to the property, see Phx. Bond & Indem. Co., 741 N.E.2d at 249.

Before the statutory redemption period expires, the owner of the property or other interested parties may redeem the encumbered property by paying the "certificate amount", the accrued penalty rate, and certain other statutorily imposed costs.[5]  See 35 Ill. Comp. Stat. Ann. 200/21-345, 21-350, 21-355.  The

---

[5]The statutory redemption period varies according to the type of property underlying the certificate of purchase of tax lien.  See 35 Ill. Comp. Stat. Ann. 200/21-350 (West 2006).  Generally, the redeeming party may redeem the property "at any time before the expiration of 2 years from the date of sale".  See id. Property that was "improved with a structure consisting of at least one and not more than 6 dwelling units" on the date of sale may be redeemed, however, within two years and six months from the date of sale.  See id. sec. 21-350(b). Additionally, the owner of a certificate of purchase of tax lien or his or her

(continued...)

**[*6]** accrued penalty rate is derived from the successful penalty percentage rate bid at auction and the time that has elapsed since the tax lien sale. See id. sec. 21-355(b). For example, if the property owner redeems the property on or before six months from the date of sale, the accrued penalty rate is the certificate amount multiplied by the penalty percentage rate bid at sale. See id. sec. 21-355(b)(1). If the property owner redeems the property after 6 months from the date of sale but on or before 12 months from the date of sale, the accrued penalty rate is the certificate amount multiplied by two times the penalty percentage rate bid at sale. See id. sec. 21-355(b)(2). The accrued penalty rate continues to increase under the statute, reaching an apex amount derived from the certificate amount multiplied by six times the penalty percentage rate bid at auction, which occurs when the redeeming party redeems the property "after 30 months from the date of sale and on or before the expiration of 36 months from the date of sale". See id. sec.21-355(b)(6). Therefore, depending upon the original bid, after 30 months from the date of sale the certificate amount accrued penalty rate could reach up to 108%.[6]

---

[5](...continued)
assignee may voluntarily extend the redemption period, provided the period is not extended beyond three years from the date of sale. See id. sec. 21-385.

[6]The "certificate amount" includes "all tax principal, special assessments, interest and penalties paid by the tax purchaser together with costs and fees of sale

(continued...)

**[\*7]** If the statutory redemption period expires and the encumbered property has not been redeemed, then the owner of the certificate of purchase of tax lien may petition for a tax deed with respect to that property. See 35 Ill. Comp. Stat. Ann. 200/22-30, 22-40. The tax deed provides the owner of the certificate of purchase of tax lien with merchantable title, see id. sec. 22-55, which is "free and clear from all previous titles and claims of every kind and character", see Killion v. Meeks, 777 N.E.2d 1007, 1011 (Ill. App. Ct. 2002); Gen. Iron Indus., Inc. v. A. Finkl & Sons Co., 686 N.E.2d 1, 6 (Ill. App. Ct. 1997). Tax deeds are "virtually incontestable", see S.I. Secs. v. Powless, 934 N.E.2d 1, 3 (Ill. App. Ct. 2010), and may be set aside only under certain limited circumstances, see 35 Ill. Comp. Stat. Ann. 200/22-45, 22-55.

Before a tax deed is issued, the owner of a certificate of purchase of tax lien may also seek judgment for a "sale in error". See id. sec. 21-310. A judgment for a sale in error may occur, for example, when a court decides that the improvements on the subject property "have been substantially destroyed or rendered uninhabitable or otherwise unfit for occupancy" after issuance of the certificate of purchase of tax lien. See id. sec. 21-310(b)(2). In such a case, the

---

[6](...continued)
and fees paid under Sections 21-295 and 21-315 through 21-335". See 35 Ill. Comp. Stat. Ann. 200/21-355(a).

**[*8]** owner of the certificate of purchase of tax lien recovers his or her investment cost in the certificate as well as a statutorily defined interest rate. See id. sec. 21-315(a).

If the certificate of purchase of tax lien holder does not record the tax deed within one year from expiration of the statutory redemption period, the certificate of purchase of tax lien and the tax deed are "absolutely void with no right to reimbursement." See id. sec. 22-85.

B. The Entities' Businesses

During the years at issue S. I. Securities and Sabre bid on and acquired certificates of purchase of tax lien at Illinois tax lien public auctions.[7] The entities' acquisition of certificates of purchase of tax lien from these auctions was extensive: at the conclusion of its 2007 and 2008 tax years S. I. Securities carried on its balance sheets approximately 2,000 certificates of purchase of tax lien and at the conclusion of its 2008 tax year Sabre carried approximately 4,500 certificates of purchase of tax lien.

---

[7]During the years at issue Sabre had no employees. Rather, employees of S. I. Securities and S.I. Securities Management, LLC--an entity not a party to these proceedings--acted for and on behalf of Sabre in various ways to further Sabre's business.

**[*9]**   In preparation to participate in these auctions, S. I. Securities and Sabre obtained lists of properties that were to be auctioned from the county tax treasurers to conduct research on the properties and to determine the amounts they were willing to bid on them at the auctions.  To provide funds to purchase the certificates of purchase of tax lien, S. I. Securities and Sabre used and drew against lines of credit that they had established with approximately 10 different banks.[8]  Because interest accrued on the used lines of credit, S. I. Securities and Sabre hoped to make a profit on the spread between the interest rates charged against their used lines of credit and the penalty rates they received if and when the certificates of purchase of tax lien were redeemed.

At various times during the years at issue Sabre assigned some of the certificates of purchase of tax lien that it had acquired during public auctions to SI Boo.[9]  After the assignment concluded, Sabre recorded in its accounting records a "sale" at book value or cost and SI Boo recorded in its accounting records the acquisition of an asset at its cost.  Since its inception and during the years at issue

---

[8]After acquiring the certificates of purchase of tax lien through these lines of credit, the banks required the entities to pledge the certificates of purchase of tax lien by physically surrendering them until they were redeemed.

[9]Like Sabre, SI Boo had no employees during the years at issue and depended upon employees from S. I. Securities and S.I. Securities Management, LLC, to act for and on behalf of SI Boo to further its business.

**[*10]** SI Boo has neither bid on nor acquired any certificates of purchase of tax lien at Illinois tax lien public auctions.  Rather, SI Boo has acquired all of its real estate properties from Sabre.

If the statutory redemption period expired and the certificates of purchase of tax lien had not been redeemed, S. I. Securities, Sabre, and SI Boo followed the legal procedures necessary under Illinois law to acquire tax deeds on those properties.[10]  Because the tax delinquent owners or other interested parties could challenge the granting of a tax deed, the entities were often required to defend against these actions in the State of Illinois courts.[11]  After acquiring tax deeds on the properties, the entities attempted to sell them to third parties by quitclaim deed or contract for deed.[12]  In attempting to sell these properties, the entities' intent

---

[10]Occasionally, upon an evaluation of the physical asset, the entities would either abandon the property or seek a judgment for a sale in error.

[11]We also take judicial notice of the entities' legal actions in the State of Illinois courts, all of which appear to reflect the entities' defense of title.  In re Application for a Tax Deed, 2011 Ill. App. 2d 101212-U (App. Ct. 2011) (unpublished); In re Cnty. Treasurer & Ex-Officio Cnty. Collector of Cook Cnty., 899 N.E.2d 432 (Ill. App. Ct. 2008); SI Secs. v. Bank of Edwardsville, 841 N.E.2d 995 (Ill. App. Ct. 2005); In re Application for Tax Deed, 723 N.E.2d 1186 (Ill. App. Ct. 2000); In re Application for Tax Deed, 675 N.E.2d 285 (Ill. App. Ct. 1997).

[12]A contract for deed is a "conditional sales contract for the sale of real property."  Black's Law Dictionary 367 (9th ed. 2009).  "[U]nder a typical

(continued...)

**[\*11]** was not to hold onto them for appreciation in value but rather to sell the properties quickly to recover their investment costs in the certificates of purchase of tax lien or to make a profit.

If the entities decided to acquire a tax deed on a property and later sell that property by quitclaim deed or contract for deed, their employees or agents would physically inspect the property, prepare paperwork for the legal proceedings, serve court documents on proper parties, and inspect the property again after obtaining the tax deed but before recording it. After acquiring the tax deed the entities would attempt to negotiate a sale price with the tax delinquent owners, tenants, or

---

[12](...continued) contract-for-deed arrangement, an agreement is reached that the property may be bought if the intended buyer first makes all the payments and complies with all other contractual obligations." Sieron & Assocs., Inc. v. Dep't of Ins., 857 N.E.2d 805, 811 (Ill. App. Ct. 2006). Generally, under Illinois law, when the owner of real estate enters into a valid and enforceable contract (including a contract for deed), that owner continues to hold legal title and the purchaser of the real estate becomes the equitable owner. See Shay v. Penrose, 185 N.E.2d 218, 219-220 (Ill. 1962) (discussing the doctrine of equitable conversion). This doctrine is not applicable in Illinois, however, where the parties clearly intend that beneficial ownership of real property not pass at execution of the contract for deed. See Ruva v. Mente, 572 N.E.2d 888 (Ill. 1991). To prevent potential unfairness for certain buyers in contracts for deed transactions, the Illinois Code of Civil Procedure treats contracts for deed as mortgages for foreclosure purposes if the contract for deed requires payments in installments over a period in excess of five years and the amount unpaid under the terms of the contract is less than 80% of the original purchase price as provided for in the contract. See 735 Ill. Comp. Stat. Ann. 5/15-1106(a)(2) (West 2011); see also In re Brown, 249 B.R. 193, 195-196 (Bankr. N.D. Ill. 2000). The contracts for deed are not in the record.

[*12] neighbors of the property. If they were unsuccessful in selling the property to these parties, the entities would place a "For Sale" sign in the property's yard or on occasion hire a real estate broker to sell the property for them.

III. Real Estate Sales

In 2007 S. I. Securities sold 46 parcels of real estate, of which it sold 29 by quitclaim deed and 17 by contract for deed. Of the 29 sales by quitclaim deed in 2007, S. I. Securities sold 17 within one year of their acquisition, sold 5 after one year but within two years of their acquisition, and sold 7 more than two years after their acquisition.[13] In 2008 S. I. Securities sold 24 parcels of real estate, of which it sold 14 by quitclaim deed and 10 by contract for deed. Of the 14 sales by quitclaim deed in 2008, S. I. Securities sold 7 within one year of their acquisition, sold 2 after one year but within two years of their acquisition, and sold 5 more than two years after their acquisition.

---

[13]S. I. Securities, Sabre, and SI Boo submitted accounting records and spreadsheets that show, with respect to their cash sales, the dates the properties were acquired by tax deed and sold to other parties. In their accounting records and spreadsheets, the entities would record the acquisition of a property asset acquired by tax deed generally no later than the date the pertinent county issued the order for tax deed. The entities would generally record the sale of a property asset on the date recorded on the deed provided to the purchaser.

[*13] In 2008 Sabre sold 111 parcels of real estate, of which it sold 86 by quitclaim deed and 25 by contract for deed.[14] Of the 86 sales by quitclaim deed in 2008, Sabre sold 73 within one year of their acquisition, sold 4 after one year but within two years of their acquisition, and sold 9 more than two years after their acquisition.

In 2007 SI Boo sold 57 parcels of property, of which it sold 52 by quitclaim deed and 5 by contract for deed. Of the 52 sales by quitclaim deed in 2007, SI Boo sold 35 within one year of their acquisition, sold 8 after one year but within two years of their acquisition, and sold 9 more than two years after their acquisition. In 2008 SI Boo sold 21 parcels of property, of which it sold 20 by quitclaim deed and 1 by contract for deed. Of the 20 sales by quitclaim deed in 2008, 18 were sold within one year of their acquisition and 2 were sold after two years of their acquisition.

All properties the entities sold by contract for deed were accounted for on the entities' respective accounting records under the installment sales method of accounting.

---

[14]Of the 86 parcels Sabre sold by quitclaim deed, 32 were assignments of certificates of purchase of tax lien to SI Boo and 1 was an assignment of a certificate of purchase of tax lien to S. I. Securities.

**[*14]** IV.  Tax Returns

For the years at issue S. I. Securities and Sabre reported income they received from the certificates of purchase of tax lien penalty percentage rates as ordinary income on their returns.  More specifically, S. I. Securities and Sabre reported on the gross receipts lines of their Forms 1065, U.S. Return of Partnership Income, the net amounts for the income received from the penalty rates minus the costs associated to acquire the certificates of purchase of tax lien.

S. I. Securities, Sabre, and SI Boo reported income they received from sales of real properties to third parties as capital gains on their Schedules D, Capital Gains and Losses.  The entities also reported on Forms 6252, Installment Sale Income, sales of properties sold by contract for deed as capital gains under the installment sales method.

A.  S. I. Securities' 2007 and 2008 Returns

On August 12, 2008, and July 7, 2009, S. I. Securities timely filed its Forms 1065 for its 2007 and 2008 taxable years.

On its 2007 Form 1065 S. I. Securities reported $347,381 of gross receipts, $620,044 of total income, $1,265,814 of total deductions, and an ordinary business loss of $645,770.  On an attached Schedule D, S. I. Securities reported capital gains of $502,299 of net short-term capital gain for the sale of properties held less

[*15] than one year and $359,660 of net long-term capital gain. On Form 6252 it reported $131,986 of installment sale income from the properties sold by contract for deed.

On its 2008 Form 1065 S. I. Securities reported $830,685 of gross receipts, $1,462,478 of total income, $1,493,533 of total deductions, and an ordinary business loss of $31,055.[15] On an attached Schedule D, S. I. Securities reported capital gains of $242,273 of net short-term capital gain for the sale of properties held less than one year and $36,846 of net long-term capital gain. On Form 6252 it reported $56,646 of installment sale income from the properties sold by contract for deed.

On its 2007 and 2008 Forms 1065, Schedules K, Partners' Distributive Share Items, S. I. Securities reported net losses from self-employment for each year.[16]

---

[15]This $1,462,878 of total income included, among other things, a $104,834 flowthrough loss attributable to SI Boo and $712,871 of "management fees" income.

[16]S. I. Securities' Schedules K-1, Partner's Share of Income, Deductions, Credits, etc., for the 2007 tax year show allocations of $430,537 and $215,233 of ordinary business losses and self-employment losses with respect to the Rochman Trust and C Deck, respectively. S. I. Securities' Schedules K-1 for the 2008 tax year are not in the record.

**[*16]** B.  Sabre's 2008 Return

On July 7, 2009, Sabre timely filed its Form 1065 for its 2008 taxable year.

On its 2008 Form 1065 Sabre reported $3,806,066 of gross receipts, $4,021,239 of total income, $3,732,250 of total deductions, and ordinary business income of $288,989.[17]  On an attached Schedule D Sabre reported $358,121 of net short-term capital gain for the sale of properties held less than one year and $87,750 of net long-term capital gain.  On Form 6252 it reported $22,433 of installment sale income from the properties sold by contract for deed.

On its 2008 Form 1065, Schedule K, Sabre reported $288,989 of net self-employment earnings.

C.  SI Boo's 2007 and 2008 Returns

On April 15, 2008 and 2009, SI Boo timely filed Forms 1065 for its 2007 and 2008 taxable years.  On June 15, 2009, SI Boo filed an amended Form 1065 for its 2008 tax year.  The amended Form 1065 reported the same ordinary business loss, but it changed the reported net short-term capital gain and net long-term capital gain.

---

[17]This $4,021,239 of total income included $100,000 of "management fees". This $3,732,250 of total deductions included $744,908 of "management fees".

[*17] On its 2007 Form 1065 SI Boo reported zero gross receipts, $3,326 of total income, $694,598 of total deductions, and an ordinary business loss of $691,272.[18]

On its 2007 Schedule D attached to its Form 1065 SI Boo reported $1,012,004 of net short-term capital gain for the sale of properties held less than one year and $553,274 of net long-term capital gain.  On Form 6252 it reported $140,823 of installment sale income from the properties sold by contract for deed.

On its 2008 Form 1065 and amended return SI Boo reported $15,989 of gross receipts, $15,989 of total income, $435,324 of total deductions, and an ordinary business loss of $419,335.[19]

On its 2008 Schedule D attached to its amended Form 1065 SI Boo reported $611,417 of net short-term capital gain for the sale of properties held less than one year and $3,971 of net long-term capital gain.[20]  On Form 6252 it reported $1,034 of installment sale income from the properties sold by contract for deed.

---

[18]This $694,598 of total deductions included $646,248 of "management fees".

[19]This $435,324 of total deductions included $410,000 of "management fees".

[20]Respondent's FPAA made adjustments based on the amended Form 1065 that SI Boo filed for its 2008 taxable year.

[*18] On its 2007, 2008, and amended Forms 1065, Schedules K, SI Boo reported net losses from self-employment for each year.[21]

## V. Respondent's FPAAs

On December 3, 2010, respondent issued FPAAs to the Rochman Trust as tax matters partner of S. I. Securities for S. I. Securities' 2007 and 2008 taxable years. On December 13, 2010, respondent issued an FPAA to the Rochman Trust as tax matters partner of Sabre Group for Sabre's 2008 taxable year. Also on December 13, 2010, respondent issued FPAAs to Boo Noz Corp. as tax matters partner of SI Boo for SI Boo's 2007 and 2008 taxable years. In the FPAAs respondent determined that because the entities held the real estate properties acquired by tax deeds primarily for sale to customers in the ordinary course of their trades or businesses the proceeds from sales of these real properties should be classified as ordinary income. Respondent also determined that the entities were

---

[21]SI Boo's Schedules K-1 for the 2007 tax year show allocations of $518,454 of ordinary business loss with respect to Boo Noz Corp. and $172,818 of ordinary business loss and self-employment loss with respect to S. I. Securities. SI Boo's original Schedules K-1 for the 2008 tax year show allocations of $314,501 of ordinary business loss with respect to Boo Noz Corp. and $104,834 of ordinary business loss and self-employment loss with respect to S. I. Securities. Although SI Boo's amended Schedules K-1 for the 2008 tax year are not in the record, they are presumably the same as the original Schedules K-1 because SI Boo's amended Form 1065 only changed the characterization of long-term capital gains to short-term capital gains.

[*19] prohibited from using the installment method of accounting because the sales were dealer dispositions under section 453(l). Having determined that the entities were using an improper method of accounting because their current method of accounting did not clearly reflect income under sections 446 and 453, respondent determined that changes in their methods of accounting were appropriate under sections 446(b) and 481. Accordingly, respondent determined that they were required to report sales of the real properties on the accrual method of accounting and made section 481(a) adjustments for certain years to report the sales of real properties made in prior years accounted for under the installment method but for which the full income was not recognized in those prior years. Respondent's adjustments to the entities' returns are shown below in the following tables:

S. I. Securities

### Ordinary income adjustments

| Adjustment | 2007 | 2008 |
|---|---|---|
| Sec. 481(a) adjustment | $532,746 | --- |
| Sec. 446 current year adjustment | 188,786 | $28,694 |
| Gross receipts (reclassified capital gains) | 150,151 | 54,377 |
| Contract for deed default expenses [1] | (48,998) | (40,870) |
| Total | 822,685 | 42,201 |

[1]Petitioners have not challenged respondent's determination with respect to the contract for deed default expenses for S. I. Securities, Sabre, or SI Boo.

[*20]                              Other adjustments

| Adjustment | 2007 | 2008 |
|---|---|---|
| Net short-term capital gain | [1]($249,298) | ($89,419) |
| Net long-term capital gain | (53,701) | (35,853) |
| Net earnings from self-employment | 822,685 | 42,201 |
| Sec. 481(a) adjustment for purposes of sec. 481(b) tax comp. | 532,746 | --- |

[1]Unlike the net long- and short-term capital gains adjustments with respect to Sabre and SI Boo, respondent's proposed adjustments to S. I. Securities' net long- and short-term capital gains do not equal the amounts of long- and short-term capital gains S. I. Securities reported on its 2007 and 2008 Schedules D.  This is because respondent decreased the capital gains to account for net long- and short-term capital gains that flowed from SI Boo to S. I. Securities in each year.

Sabre

2008 Ordinary income adjustments

| Adjustment | Amount |
|---|---|
| Sec. 446 current year adjustment | $167,074 |
| Gross receipts (reclassified capital gains) | 291,656 |
| Contract for deed default expenses | (39,511) |
| Total | 419,219 |

Other adjustments

| Adjustment | Amount |
|---|---|
| Net short-term capital gain | ($358,121) |
| Net long-term capital gain | (87,750) |
| Net earnings from self-employment | 419,219 |

[*21] SI Boo

## Ordinary income adjustments

| Adjustment | 2007 | 2008 |
|---|---|---|
| Sec. 481(a) adjustment | $88,117 | --- |
| Sec. 446 current year adjustment | 132,816 | --- |
| Gross receipts (reclassified capital gains) | 1,423,893 | $601,667 |
| Contract for deed default expenses | --- | (4,910) |
| Total | 1,644,826 | 596,757 |

## Other adjustments

| Adjustment | 2007 | 2008 |
|---|---|---|
| Net short-term capital gain | ($1,012,004) | ($611,417) |
| Net long-term capital gain | (553,274) | (3,971) |
| Net earnings from self-employment | 1,644,826 | 596,757 |
| Sec. 481(a) adjustment for purposes of sec. 481(b) tax comp. | 88,117 | --- |
| Charitable contribution--30%[1] | 18,595 | --- |

[1] Although this adjustment is at issue, the parties agree that resolution of it depends on whether SI Boo held the real estate properties primarily for sale to customers in the ordinary course of its trade or business.

## OPINION

### I. Burden of Proof

Petitioners filed a motion on December 2, 2013, to shift the burden of proof and also asserted in their opening brief that the burden should shift to respondent. Generally, the Commissioner's determinations in a notice of deficiency are

**[\*22]** presumed correct, and the taxpayer bears the burden of proving that the

determinations are incorrect.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115

(1933).  Petitioners contend, however, that the burden of proof with respect to any

relevant factual issue should shift to respondent under section 7491.  Respondent

disagrees.  We conclude it is unnecessary to address the parties' disagreements

and to determine whether the burden of proof should shift because the outcome of

each of the present cases is determined on the preponderance of the evidence.  See

Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005).

II.  Sales of Real Properties

Respondent contends that the entities are not entitled to capital gains

treatment with respect to their sales of real properties acquired by tax deed

because the real properties are held by the entities primarily for sale to customers

in the ordinary course of their trades or businesses under section 1221(a)(1).

Petitioners disagree and contend that income from these sales should be treated as

gains from capital assets.

Section 1221 provides that a capital asset is "property held by the taxpayer

(whether or not connected with his trade or business)".  Congress has provided in

section 1221 eight specific types of property excepted from the definition of a

capital asset.  See sec. 1221(a)(1)-(8).  One of these exceptions provides that the

[*23] term "capital asset" does not include "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business". See sec. 1221(a)(1). The term "primarily" for purposes of section 1221 means "of first importance" or "principally". See Malat v. Riddell, 383 U.S. 569, 572 (1966).

Congress intended that capital asset treatment be an exception to the normal requirements of the Code and that the profits generated by everyday business operations be ordinary income. Id. ("The purpose of * * * [section 1221] is to differentiate between the 'profits and losses arising from the everyday operation of a business' on the one hand * * * and * * * 'the realization of appreciation in value accrued over a substantial period of time' on the other." (quoting Corn Prods. Ref. Co. v. Commissioner, 350 U.S. 46, 52 (1955), and Commissioner v. Gillette Motor Transp., Inc., 364 U.S. 130, 134 (1960))); Guardian Indus. Corp. & Subs. v. Commissioner, 97 T.C. 308, 315 (1991), aff'd without published opinion, 21 F.3d 427 (6th Cir. 1994). To further congressional intent, courts interpret preferential capital gains treatment narrowly and the exceptions to capital gains treatment in section 1221(a)(1)-(8) broadly. Hansche v. Commissioner, 457 F.2d 429, 432 (7th Cir. 1972) (citing Corn Prods. Ref. Co. v. Commissioner, 350 U.S. at 52), aff'g T.C. Memo. 1970-342; Sovereign v. Commissioner, 281 F.2d 830,

**[*24]** 835 (7th Cir. 1960) (citing <u>Corn Prods. Ref. Co. v. Commissioner</u>, 350 U.S. at 52), <u>aff'g</u> 32 T.C. 1350 (1959).

Whether property is held primarily for sale to customers in the ordinary course of a taxpayer's trade or business is a question of fact which must be determined by consideration of all the surrounding circumstances. <u>See</u> <u>Guardian Indus. Corp. & Subs. v. Commissioner</u>, 97 T.C. at 316; <u>Pritchett v. Commissioner</u>, 63 T.C. 149, 162 (1974). Generally, to determine the purpose for which property is primarily held courts look to the taxpayer's purpose at the time the property was sold although courts can consider events that occurred before that time in order to identify that purpose. <u>See</u> <u>Taiyo Hawaii Co., Ltd. v. Commissioner</u>, 108 T.C. 590, 612 (1997); <u>Guardian Indus. Corp. & Subs. v. Commissioner</u>, 97 T.C. at 316. In determining the taxpayer's holding purpose, more weight is given to objective evidence than the taxpayer's own statements of intent. <u>See</u> <u>Guardian Indus. Corp. & Subs. v. Commissioner</u>, 97 T.C. at 316; <u>Daugherty v. Commissioner</u>, 78 T.C. 623, 630 (1982).

Courts consider numerous factors when deciding the taxpayer's primary purpose for holding property. <u>See</u> <u>Major Realty Corp. & Subs. v. Commissioner</u>, 749 F.2d 1483, 1488 (11th Cir.1985), <u>aff'g in part, rev'g in part</u> T.C. Memo. 1981-361; <u>King v. United States</u>, 641 F.2d 253, 269 (5th Cir. 1981); <u>Sovereign v.</u>

[*25] Commissioner, 281 F.2d at 833; Cottle v. Commissioner, 89 T.C. 467, 487 (1987). No single factor or combination of factors is controlling. See Sovereign v. Commissioner, 281 F.2d at 833; Guardian Indus. Corp. & Subs. v. Commissioner, 97 T.C. at 316. The factors include: (1) the frequency and regularity of sales of real properties; (2) the substantiality of the sales and the relative amounts of income taxpayers derived from their regular business and the sales of real properties; (3) the length of time the taxpayers held the real properties; (4) the nature and extent of the taxpayers' business and the relationship of the real properties to that business; (5) the purpose for which the taxpayers acquired and held the real properties before sale; (6) the extent of the taxpayers' efforts to sell the property by advertising or otherwise; and (7) any improvements the taxpayers made to the real properties. See Sovereign v. Commissioner, 281 F.2d at 833; Guardian Indus. Corp. & Subs. v. Commissioner, 97 T.C. at 317. After applying the factors we consider relevant for disposition of these cases, we find that the entities acquired and held the real properties primarily for sale to customers in the ordinary course of their trades or businesses.[22]

---

[22]On brief petitioners argue that the entities did not make sales to "customers" pursuant to sec. 1221(a)(1). We disagree. The term "customers" has been given a broad meaning except in those cases involving taxpayers dealing or trading in securities. See Guardian Indus. Corp. & Subs. v. Commissioner, 97

(continued...)

[*26] Petitioners contend that the entities' sales of real properties were not frequent in comparison to the number of certificates of purchase of tax lien they acquired during the years at issue. Respondent contends that the entities' sales of real properties were frequent and regular for each year without any trend to holding the properties as investments. We agree with respondent.

In 2007 and 2008 S. I. Securities sold 29 and 14 parcels of real estate, respectively, by quitclaim deed. In 2008 Sabre sold 86 parcels of real estate by quitclaim deed, of which 53 were sold to third parties and 33 were assigned to SI Boo or S. I. Securities. In 2007 and 2008 SI Boo sold 52 and 20 parcels of real estate, respectively, by quitclaim deed. The entities' own accounting records, as well as the testimony presented at trial, showed that the entities desired to dispose of the real properties quickly and frequently and with the intent to make a profit and were successful. In fact, petitioners effectively concede on brief that most of the properties S. I. Securities, Sabre, and SI Boo sold by quitclaim deed during the

_____

[22](...continued)
T.C. 308, 308 n.2 (1991); see also Pointer v. Commissioner, 48 T.C. 906, 917 (1967) ("Indeed, it has been said that in real estate transactions a sale to any purchaser is, in effect, a sale to a 'customer'."), aff'd, 419 F.2d 213 (9th Cir. 1969).

[*27] years at issue were sold within one year of their acquisition.[23]  On this

record, we give little weight to the fact that the entities acquired more certificates

of purchase of tax lien than tax deeds.  In sum, the entities' sales of real properties

were frequent and regular during the years at issue.  See, e.g., Garrison v.

Commissioner, T.C. Memo. 2010-261 (holding that amounts received from 15 real

property sales during a three-year period constituted ordinary income); Clayton v.

Commissioner, T.C. Memo. 1956-21 (holding that amounts received from 17 real

property sales during a four-year period constituted ordinary income), aff'd, 245

F.2d 238 (6th Cir. 1957).

The record also shows that the entities' sales of real properties were

substantial during the years at issue, especially when viewed with respect to the

total amounts of income each entity earned in those years.  Throughout its 2007

and 2008 taxable years, S. I. Securities sold real estate properties in exchange for

what S. I. Securities reported as $861,959 and $279,119 of capital gains,

respectively.  Conversely, S. I. Securities reported on its 2007 and 2008 returns

---

[23]Specifically, petitioners made no objection to respondent's proposed findings of fact that with respect to the entities' own accounting records of sales by quitclaim deed:  in 2007 and 2008 S. I. Securities sold 58% and 50% of its properties within one year of acquisition, respectively; in 2008 Sabre sold 85% of its properties within one year of acquisition; and in 2007 and 2008 SI Boo sold 67% and 90% of its properties within one year of acquisition, respectively.

[*28] ordinary business losses of $645,770 and $31,055, respectively. Throughout its 2007 and 2008 taxable years, SI Boo sold real estate properties in exchange for what SI Boo reported as $1,565,278 and $615,388 of capital gains, respectively. Conversely, SI Boo reported on its 2007 and 2008 returns ordinary business losses of $691,272 and $419,335, respectively. Throughout its 2008 taxable year, Sabre sold real properties in exchange for what Sabre reported as $445,871 of capital gain. For 2008 Sabre reported positive ordinary income of $288,989, but there is little doubt that the $445,871 of reported capital gain constituted a significant portion of Sabre's total income earned in 2008. This factor also weighs heavily against the entities. See Guardian Indus. Corp. & Subs. v. Commissioner, 97 T.C. at 320.

As a general matter, frequent, regular, and substantial sales of real property are indicative of sales being made in the ordinary course of a trade or business, whereas infrequent sales of these properties are more indicative of real property held for investment purposes. See Phelan v. Commissioner, T.C. Memo. 2004-206; Paullus v. Commissioner, T.C. Memo. 1996-419. Additionally, frequent, regular, and substantial sales often have been held to be the most important objective indicators of whether property is held primarily for sale to customers in the ordinary course of a taxpayer's trade or business. See Major Realty Corp. v.

[*29] <u>Commissioner</u>, 749 F.2d 1483; <u>Hous. Endowment, Inc. v. United States</u>, 606 F.2d 77 (5th Cir. 1979); <u>Guardian Indus. Corp. & Subs. v. Commissioner</u>, 97 T.C. at 320. These factors weigh heavily against the entities. <u>See</u> <u>Guardian Indus. Corp. & Subs. v. Commissioner</u>, 97 T.C. at 320.

Petitioners also presented testimony that the entities either had employed persons or had employees from other entities act for and on behalf of their businesses in acquiring tax deeds, preparing the properties for sale, and maintaining accounting and other records in the course of their trades or businesses. This factor also supports a finding that the real properties were not capital assets. <u>See</u> <u>Wood v. Commissioner</u>, 25 T.C. 468, 474-475 (1955) (noting that maintenance of office and full-time employment of office assistant to keep books and records relating to purchase and sale of lots and land contracts indicated taxpayer was in trade or business of selling real estate and that properties sold during years at issue were held primarily for sale to customers in ordinary course of that trade or business).

The nature of the entities' trades or businesses, the relationship of the sales of real property to those trades or businesses, and the sales of real estate properties being in furtherance of the entities' trades or businesses also weigh against them. <u>See Guardian Indus. Corp. & Subs. v. Commissioner</u>, 97 T.C. at 321 (and cases

**[*30]** cited threat). Although petitioners contend that the entities' primary business purpose in acquiring the certificates of purchase of tax lien was to make a profit on the penalty rates and not to acquire real estate properties, the record shows that the sales of these real properties were an integral components in their respective trades or businesses, permitting them to profit from both the acquisition of the certificates of purchase of tax lien and the sales of properties if those certificates were not redeemed. See id. at 321 ("[W]e decline to artificially segment what is in reality an integrated business operation.").

In light of the foregoing, we conclude that the real properties that the entities acquired from certificates of purchase of tax lien and converted into tax deeds are properties held by them primarily for sale to customers in the ordinary course of their trades or businesses.

III. Installment Sales Method of Accounting

Petitioners argue that under section 453 the entities are entitled to use the installment sales method to account for their sales of properties by contract for deed.[24] Respondent disagrees, contending that the entities are precluded under

---

[24]Petitioners also argue on brief that the Court should consider the entities' reliance on a purported settlement between S. I. Securities and the Internal Revenue Service in regard to alleged concessions made by the IRS with respect to certain installment sale adjustments and changes of accounting method for

(continued...)

[*31] section 453(b)(2)(A) from using the installment sales method because the sales are "dealer dispositions".[25]

Section 453(a) provides that, except as otherwise provided, income from an installment sale shall be taken into account under the installment method. An installment sale is defined as a disposition of property where at least one payment is to be received after the close of the taxable year in which the disposition occurs. Sec. 453(b)(1). The installment method is defined as a method under which the income recognized for any taxable year from a disposition is that proportion of payments received in that year which the gross profit (realized or to be realized when payment is completed) bears to the total contract price. Sec. 453(c).

---

[24](...continued) previous tax years. We reject petitioners' argument. Each tax year stands alone, and the Commissioner may challenge in a succeeding year what was condoned or agreed to for a prior year. See Rose v. Commissioner, 55 T.C. 28, 31-32 (1970).

[25]At trial respondent conceded that two properties sold by contract for deed and included in a sec. 481 adjustment with respect to S. I. Securities' 2008 taxable year should not be included in that adjustment as those sales were specifically included in adjustments for prior years. The amount of the concession will be resolved in Rule 155 computations to be submitted in accordance with this opinion.

[*32] Section 453(b)(2)(A) prohibits the use of the installment method with regard to income from a "dealer disposition".[26]  See also sec. 453(a) and (b)(1).  The term "dealer disposition" includes "[a]ny disposition of real property which is held by the taxpayer for sale to customers in the ordinary course of the taxpayer's trade or business."  Sec. 453(l)(1)(B).  As discussed above, we have already found that the entities disposed of real properties that were held for sale to customers in the ordinary course of their trades or businesses.  Accordingly, we conclude that the entities may not use the installment method to account for their sales of real properties made by contract for deed, and those sales are appropriate for section 481 adjustments.[27]  See Keith v. Commissioner, 115 T.C. 605, 619 (2000); Raymond v. Commissioner, T.C. Memo. 2001-96.

---

[26]According to the legislative history, the preclusion of the installment sales method for dealer dispositions was enacted because it was "believed that dealer sales of property for notes or accounts receivable * * * [did] not create the significant cash-flow problems that the installment method * * * [was] designed to alleviate".  See S. Comm. on Finance, 100th Cong., 1st Sess., Explanation of Provisions Approved by the Committee on December 3, 1987, for Inclusion in Leadership Deficit Reduction Amendment 145 (Comm. Print 1987).

[27]As respondent determined in these cases, a sec. 481(a) adjustment may include amounts attributable to tax years outside the period of limitations on assessment.  See Bosamia v. Commissioner, 661 F.3d 250, 257-258 (5th Cir. 2011), aff'g T.C. Memo. 2010-218; Mingo v. Commissioner, T.C. Memo. 2013-149, aff'd, __ F.3d __, 2014 WL 6914367 (5th Cir. Dec. 9, 2014).

[*33] IV.  Self-Employment Earnings

Section 1401(a) and (b) imposes a tax on the net earnings from self-employment derived from any trade or business carried on by the taxpayer.  Sec. 1.1401-1(a), Income Tax Regs.  The entities previously excluded the real estate sales from the net earnings computation and reported the real estate sales as capital gains and not subject to a tax on the net earnings.  On the basis of our findings that the entities earned income from the proceeds of sales of real properties, which was an integral part of their respective trades or businesses, we hold that the entities should have included the income in their reported net earnings from self-employment.[28]  See sec. 1402(a).

V.  Conclusion

The entities' real estate properties that were acquired by tax deed were property held by them primarily for sale to customers in the ordinary course of their trades or businesses, precluding characterization of those assets as capital assets.  Because these real estate properties were disposed of by the entities while held by them for sale to customers in the ordinary course of their trades or businesses, the entities are foreclosed from using the installment sales method of

---

[28]The exact amount of tax resulting from the entities' self-employment earnings shall be computed as part of the Rule 155 calculations.

**[*34]** accounting under section 453. Additionally, the entities did not properly report net income from self-employment earnings under section 1401.

The Court has considered all of petitioners' contentions and arguments. To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

<u>Decisions will be entered under Rule 155</u>.